[Crim. No. 1536. Second Appellate District, Division One.—
December 13, 1927.]

THE PEOPLE, Respondent, v. DOROTHY MacKAYE
RAYMOND, Appellant.

Jerry Giesler and Roger Marchetti for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

McLUCAS, J., *pro tem.*—An indictment was returned by the grand jury of Los Angeles County charging appellant Dorothy MacKaye Raymond and Dr. Walter James Sullivan in count I of being accessories to a murder committed, and in count II of compounding a felony, to wit, the crime of murder. Dr. Sullivan was granted a separate trial. Count I was dismissed by the court at the close of the people's case. Dorothy MacKaye Raymond was convicted under count II, and appeals from the judgment and from an order denying her motion for a new trial.

Appellant was the wife of Ray Raymond, the deceased, and both of them were actors. About eight weeks before his death the deceased went to San Francisco to fill a theatrical engagement, and during a part of this time appellant was doing theatrical work in Los Angeles and San Francisco. Paul Kelly was a moving picture actor, living in Hollywood, and knew both Mr. and Mrs. Raymond in New York before they came to California. While the deceased was absent from home Paul Kelly and appellant associated together. He often met her at the theater after evening performances and took her home, or to his home; and when she was out of employment they were in each other's company much of the time. A Japanese servant in Paul Kelly's home testified that Miss MacKaye (appellant's stage name) stayed at Mr. Kelly's house eighteen times; that she stayed overnight; that he had once seen Miss MacKaye in bed with Kelly; and that he served breakfast to them in the dining-room. Letters and telegrams addressed by Kelly to appellant contained passionate declarations of love. Appellant testified that she and Paul Kelly talked about getting married, but not seriously; and also that she and the deceased had talked about a separation and divorce. It also appears that Ray Raymond and the appellant had frequently quarreled over Kelly's attentions to appellant, and at one time Raymond had ordered Kelly to stay away from his home.

Ray Raymond, the deceased, arrived home from his theatrical engagement about 1 P. M. on Friday, April 15th, and was greeted by appellant. The deceased stayed at home all afternoon, playing with his four and one-half year old daughter; drinking considerable gin and becoming somewhat intoxicated. Appellant, in the middle of the afternoon, went to the home of Paul Kelly and visited for about an hour. On the following day (Saturday) she, in company with her friend, Miss Wilkinson, again visited Paul Kelly at his home between 1 and 2 o'clock in the afternoon. They drank some gin and appellant and Miss Wilkinson left Kelly's home about 6 P. M. Shortly before that time Kelly left the living-room and went into a back room to use the telephone, and after telephoning he went through the living-room, where appellant, Miss Wilkinson, and Max Wagner were sitting, and then to the home of the deceased,

Ray Raymond, where he arrived about 6 o'clock. Miss Lee, a colored maid in the Raymond home, admitted Kelly into the home of the deceased. According to the testimony of Miss Lee, Kelly appeared to be very angry. He and Raymond sat down on the divan, and when the deceased referred to his wife, Miss MacKaye, Kelly struck Raymond in the face three or four times with his fist. Raymond got up and went into the dining-room. Kelly caught Raymond by the shoulder, dragged him back into the living-room and threw him toward the divan. Raymond struck his head against the divan, and then Miss Lee helped him up. Kelly and Raymond sat down on the divan, and again Kelly struck Raymond. Raymond then struck Kelly for the first time. Both men got up and Kelly struck Raymond and knocked him down five or six times. They were clinched and struck each other. Kelly caught Raymond and held him by the back of the neck and struck him in the face with his fist. Raymond staggered back again into the dining-room, against the dining-room table. Kelly struck Raymond again in the face. The witness testified that the entire left side of Raymond's face was swollen; his lips swollen and bleeding; his left eye swollen and purple, and his forehead bruised.

Appellant arrived home about 7:30 or 8 o'clock P. M. the same evening. The appellant testified that about 9 o'clock on that evening she again went to the home of Kelly and reprimanded him for fighting with her husband; that she remained with Kelly for about forty-five minutes, drove to the beach and returned home, where she talked with her husband until 3 o'clock A. M., when they retired. Appellant also testified that before retiring the conduct and actions of the deceased were normal, and that he did not appear to be seriously ill or injured. At 7 o'clock on the following (Sunday) morning appellant heard the deceased moaning on the floor between the twin beds, and she immediately called the servant, Miss Lee. Miss Lee testified that some time after 2 o'clock Sunday morning she saw deceased come out of his room and go into the bath-room; that he held out both hands and acted as though he could not see, although the lights were turned on; that she next saw the deceased at 7 o'clock Sunday morning, lying on the floor between the twin beds; that he appeared to be

unconscious, breathing unnaturally, with a gurgling sound, and frothing at the mouth; that at the request of appellant she lifted the deceased back into his bed; that Dr. Sullivan was called and arrived about 2 o'clock P. M.; that Raymond's eye was still black and his face swollen; that Dr. Sullivan asked appellant if Raymond had been hit, and appellant said "yes," and Dr. Sullivan said Raymond was in a serious condition and should be removed to the hospital; that Raymond was taken to the hospital in an ambulance about 3 o'clock P. M. on Sunday; that about 6 o'clock Monday evening she answered the telephone and Dr. Sullivan asked for Mrs. Raymond, and she told him Mrs. Raymond was on her way to his office; that Dr. Sullivan replied, "I am not going to wait here for Jesus Christ's sake; the newspaper reporters are after me; this is a police case and I will have to report it, and if Mrs. Raymond doesn't get here, her name will be in the newspapers tomorrow morning"; that within a few minutes afterward she conveyed the gist of this conversation to Mrs. Raymond.

The deceased died at the hospital at 5:20 o'clock the following (Tuesday) morning. Max Wagner, who lived with Kelly, testified that on Sunday afternoon, between 3 and 4 o'clock, appellant and her friend, Miss Wilkinson, came to Kelly's house and told them that Raymond had been sent to the hospital; that they did not stay at Kelly's house very long. Kelly testified that on Tuesday morning, around 6 or 7 o'clock, he learned from Wagner, who had received the information by telephone from Miss Wilkinson, that Raymond had died that morning.

Frank H. Schoeffel, deputy coroner of Los Angeles County, testified that he had a telephone conversation with Dr. Sullivan on Tuesday morning, April 19th, about 7:30 o'clock, as follows: "Q. Just relate the conversation. A. The party said, 'This is Dr. Sullivan, and I want to report a case that I believe is a medical case, but I just want to see what you have to say about it.' So I said, 'What are circumstances, Doctor?' And he said, 'I had a patient come to me in a state of coma two or three days ago and he has since died.' And he felt that it was a medical case, that he could sign it. Q. Do you mean sign the death certificate? A. Sign the death certificate, and I asked him if he signed it how he would sign it, and he stated 'Acute

or chronic alcoholism with nephritis.' I asked him if there were any marks of violence on the body, and he said not to his knowledge; I said, 'Any history of violence?' and he said not to his knowledge. I asked where the body was then and he said at the Roy Bagley Undertaking parlors. I said, 'On whose order?' He said he believed on the order of the family. I further asked him if there was any insurance and he said he didn't know that. During that time the chief deputy had come in and I asked him to hold the wire until I found out what the chief deputy would say, and I told the chief deputy— Mr. Giesler: I object to that. The Court: Don't state any conversation with the Coroner or his chief deputy unless it was in the presence of the defendant. A. After consulting with him I told him it was all right for him to sign it, if the circumstances were as he reported. Mr. Murray: Did he state to you at that time that the man had a black eye? A. No, sir. Q. That he had a couple of ribs fractured? A. No, sir. Q. That he had a mark on his left chest three inches in width and four inches in length? A. No, sir. Q. Did he tell you that he had four or five bruises on the left-hand side of his forehead? A. No, sir. Q. When was the first time that you saw Dr. Sullivan after that? A. The morning of the inquest, that was two or three days afterwards.''

Miss Lee testified that Dr. Sullivan came to the Raymond home about 9:30 o'clock on Tuesday morning, the day Raymond died, and conversed with Miss MacKaye and Miss Wilkinson in the sun parlor for half an hour, and then all of them left the house, and that appellant returned in half an hour and said she had been to Dr. Sullivan's office and he wanted her to pay his bill at once. Kelly testified that Miss Wilkinson phoned him near 11 o'clock on the morning that Raymond died that Miss MacKaye (Mrs. Raymond) wanted to borrow $800; that he went to the bank and withdrew $800 and handed it to Max Wagner, who went to appellant's house. Wagner testified that he gave the $800 which he received from Kelly to appellant that same morning. Frank M. Loomis, a friend of deceased, testified that he received a telephone call from Miss Wilkinson requesting him to come to the Raymond home, and that on his arrival Miss MacKaye gave him $800 in currency and requested him to pay the hospital and doctor

bills, she stating that the doctor's bill would be $500; that he and Miss Wilkinson went to Dr. Sullivan's office and that he paid Dr. Sullivan $500 out of the $800 which appellant gave him, and took his receipt therefor. At 4:15 on the day of decedent's death, appellant made a statement to police officers in which she stated that there had been strained relations between herself and husband for a couple of years; that Raymond was always accusing her of seeing Paul Kelly. She was asked: "Was there anything that might arouse Mr. Raymond's temperament between you and Mr. Kelly?" and she answered: "Well, he told me that he had forbidden me to see Paul and Paul was my friend first and Ray wasn't kind to me. It is a terrible thing to say since this awful thing has happened, but, after all, I can't help it, and I felt that Paul's friendship for me was very clean; it was very lovely and very beautiful, and I didn't want to give it up." She also stated that Raymond had previously ordered Kelly out of his house; that she went over to see Kelly on Easter Sunday, and that Kelly told her how the fight had started, and that "he said that Ray had said a lot of terrible things about us and wouldn't stand for it. Q. Meaning you and him? A. Yes, and our friendship. Q. That your husband had said a lot of things about you and Mr. Kelly and Mr. Kelly said he wasn't going to stand for it? A. Yes." At the conclusion of her statement to the police officers, appellant said: "In case you find that his death didn't result from that, how much of this will come out? I am asking this for my baby and I have to make a living, you know. How soon will you know?"

On or about April 19th an autopsy was performed on the body of the deceased. Dr. A. F. Wagner, autopsy surgeon, testified: "A. I found two contusions of the forehead shown on reflecting back the scalp, also ecchymosis of the left eye—that is, a black and blue bruised left eye. On opening the skull I found a large subdural hemorrhage, covering the entire right lateral surface of the right hemisphere of the brain. There was no fracture of the skull bones, nor any injury of the brain, except the pressure effects of the subdural hemorrhage. There were contusions on the right shoulder on its outer side, also the outer side of the left fore-arm, on the anterior surface of both shins,

and on the left instep. There was also a contusion on the left side of the chest about three or four inches extending outward from the left nipple to the left lateral surface of the chest. On opening the body I found the fourth rib fractured near its cartilagenous junction and the fifth rib cracked, but not completely fractured, about an inch to the left of the seat of fracture in the fourth rib. Both lungs showed considerable hypostatic congestion, and the anterior portion of the right lung was in a condition of pneumonia, sections of which sank in water, constituting a hypostatic pneumonia. The heart was normal; the liver markedly fatty, and the kidneys slightly swollen, but normal in color and free from organic disease. The system contained a small quantity of decidedly greenish bile contents. I subsequently had a microscopic examination made of the kidneys; that, under the microscope, showed a few sclerotic changes in the kidney. Q. Anything else other than that? A. No, sir. Q. Did you form an opinion as to what was the cause of death, Doctor? A. I did. Q. What was it? A. The cause of death was hypostatic pneumonia, following extensive subdural hemorrhage on the right side of the brain. I added 'continubutory acute alcoholism.' Q. Now, what was the sole or main cause of death, Doctor? A. Subdural hemorrhage. Q. What is a subdural hemorrhage? A. A subdural hemorrhage is a hemorrhage between the dura mater, one of the coverings of the brain, and the brain itself.'' He further testified that the hemorrhage was traumatic, or one caused by an injury. Dr. Sullivan and Dr. McHugh, a consulting physician, were present at the autopsy. Dr. Wagner testified: ''A. About the first thing I asked was, directing my question to both of the doctors, I asked them what the history of the case was. Dr. McHugh spoke up and said, 'We don't know much about this case. He was on a spree for several days and we think he fell.' Q. Did Dr. Sullivan say anything to that? A. Dr. Sullivan was standing right by and he never said anything.'' The witness further testified that he spoke of the advisability of opening up the head, and Dr. Sullivan said: ''Yes, we want to open up the head because we suspect either a skull fracture or a hemorrhage.'' And that the spinal puncture showed blood, which caused him to suspect that there was a hemorrhage or a skull fracture. Dr.

Wagner further testified: "Mr. Kemp: Did Dr. Sullivan or Dr. McHugh in Dr. Sullivan's presence tell you that Ray Raymond had been in a fight? A. No, sir."

The foregoing is a review of the main points in the testimony relied upon by the prosecution. It is contradicted in many respects by the testimony of defendant's witnesses; but we believe the statement of the case to be sufficient for the purpose of discussion of the points raised by appellant.

The first point presented by appellant is that the court erred in limiting and restricting appellant's examination of the jurors on *voir dire,* and in refusing the request of the defendant to examine every juror individually with respect to their acquaintance and conversation, if any, with the jurors from the panel who had sat as trial jurors in the case of *People* v. *Kelly,* wherein defendant Kelly was charged with the crime of the murder of Ray Raymond. ▉ The superior court of Los Angeles County is divided into a number of departments. The trial of this case was had in Department 21, and jurors were first called from Department 24. At the commencement of the trial, and before trial jurors were called to the jury-box for examination, appellant interposed an objection to the panel upon the ground that it was from this panel that the jurors were selected who sat in the case of *People* v. *Paul Kelly* when he was tried for the murder of Ray Raymond and convicted of the crime of manslaughter, and that the same jurors called in appellant's case were examined in that case and excused. No claim is made that any juror who sat in Kelly's trial also acted or was called as a juror in appellant's case. The trial court overruled appellant's objection to the panel. A challenge to the panel can be founded only upon a material departure from the forms prescribed in respect to the drawing and return of the jury in civil actions, or on an intentional omission of the sheriff to summon one or more of the jurors drawn. (Pen. Code, sec. 1059.) Appellant made no claim that there was a departure from the forms prescribed in respect to the drawing or return of the jury, or that the sheriff omitted to summon one of the jurors drawn. Appellant's objection to the panel was, therefore, properly overruled. (*People* v. *Giminiani,* 76 Cal. App. 352 [244 Pac. 625].)

The jurors were then examined collectively by the court as to their general qualifications. Mrs. Lillehoff, the first juror called, was then examined by appellant's counsel and stated that she had been called as a juror in the Kelly case and was challenged and excused; that she did not hear anything concerning the Kelly case in the courtroom during the time she was present; that some of the members of the panel were selected as jurors in the Kelly case; that after the Kelly case was concluded she talked to one juror who sat in that case concerning some of the facts of the case, and that she did not form any opinion as to the guilt or innocence of Mr. Kelly concerning the charge of murder against him. The trial court then questioned Mrs. Lillehoff as follows: "The Court: Just a moment before you pass to Mrs. Kirkwood. Let me ask you, Mrs. Lillehoff, then, has anything you have heard said by any of your fellow jurors from the panel of Department 24, or by anybody else, or any discussion you have had with anyone, no matter who it was, whether on the jury or not, caused you to form any opinion whatsoever as to the facts of this case? A. No, sir. Q. You have not been influenced in any way by anything you have heard either for or against the defendant in this case or for or against the People; is that correct? A. No, sir, I have not. Q. Now, as to the rest of you ladies and gentlemen from Department 24, would you all answer that question as Mrs. Lillehoff had answered it or different? (No response.) I take it you would all answer the same way as she did, then. Then that ground has already been covered, Mr. Giesler. Mr. Giesler: Am I precluded from interrogating each individual juror as to that matter? The Court: Yes. They have already answered the question. Mr. Giesler: I challenge Mrs. Lillehoff for cause. The Court: Better wait until it is time, hadn't you? Mr. Giesler: For cause. Mr. Murray: We resist that, your Honor. The Court: Challenge not allowed. In the first place, no cause has been stated. Mr. Giesler: I therefore ask permission to interrogate the other individual jurors on the same grounds, so as to ascertain their state of mind concerning the action. The Court: You may interrogate any of the jurors you desire, except that the court will not permit you to repeat any of the questions that have been asked and answered by the jurors

520

in the box. Mr. Giesler: I appreciate that I could not do that, except this, I did ask special permission of your Honor to interrogate the individual jurors. The Court: The court would not allow its time or the time of the jury to be wasted by repeating questions. Mr. Giesler: But in this particular case— The Court: You have heard what the court said. Mr. Giesler: Very well, sir. Now, if your Honor please, if I cannot interrogate these jurors individually, then, simply as to matters I am permitted to do so, may I interrogate them collectively in regard to the matters I desire to interrogate them about? The Court: Oh, yes. It would save time if you can do that as much as possible.'' After examining several of the jurors individually as to occupation, counsel for appellant examined the jury as a whole at great length, among other matters, as to whether they would permit any prejudice to influence their verdict, and whether they would require the prosecution to prove the defendant guilty beyond a reasonable doubt of the particular crime as charged, and whether they would allow the fact that Paul Kelly had been found guilty in another case to influence their verdict in the case on trial. After both sides had passed the jury for cause, peremptory challenges were exercised, and the court questioned the first juror called after a peremptory challenge, as follows: ''By the Court: Q. Mrs. Eaton, did you hear the general statement of the nature of the case which I made to the others in the box with you? A. Yes, sir. Q. And you have heard all the questions that have been asked both by the court and counsel on both sides of this case? A. I have. Q. Would you answer any of those questions, either those asked by the court or Mr. Giesler or Mr. Murray, any differently than those in the box with you answered the questions? A. I would not. Q. You would answer them just the same as they did, would you? A. Yes, sir. The Court: All asked and answered, then, except as to your occupation, and address and so forth.'' The court permitted the appellant to examine this juror as to whether she was selected as a juror in the Kelly case, and at no time refused appellant the right to ask this question individually of each juror. The juror was interrogated as follows: ''Q. Were you selected as a juror in the Kelly case? A. No, sir. Q. Were you

examined as a juror? A. No, sir. Q. Were you in the courtroom? A. I came in a few minutes before half-past four when the jury was being called. Q. But you got here too late? A. Yes, sir. Q. Are you acquainted with the ladies and gentlemen, whichever they may have been, from your department, who sat on that case? The Court: That question was covered in the questions that were asked of Mrs. Lillehoff and Mrs. Eaton has answered that her answers would be the same as Mrs. Lillehoff's. Mr. Giesler: So I am precluded from that, your Honor? The Court: Yes, that has been covered already." All other jurors called after the jury had been passed for cause were examined by the court in substantially the same manner as Mrs. Eaton was examined, and at least one juror was specifically asked by the court as to whether she had served in the Kelly case; whether anything she had heard from fellow-jurors or from anybody else had caused her to form any opinion one way or the other on any of the facts in this case. Appellant claims error on the part of the trial court in refusing to allow her to interrogate each juror individually as to whether or not he or she had talked about the Kelly case with a juror who sat in that case, and, if so, whether the juror had formed any opinion as to the facts of the case on trial from what he or she had heard from such juror. Appellant cites the case of *People* v. *Riordan*, 79 Cal. App. 488 [250 Pac. 190], where the trial court refused to permit certain questions to be asked of each individual juror when these same questions had been asked and answered by the jurors collectively, and states that the case is not to be used as authority in this case for the reason that the appellate court only qualifiedly approved the action of the trial court in that case by holding that, under the circumstances of the case, there was no invasion of the defendant's substantial rights to his prejudice; also, that in the Riordan case the questions which defendant desired to ask the jury individually related to matters for a peremptory challenge and not a challenge for cause, whereas, in her case, the question related to matters upon which a challenge for cause could be predicated. In the Riordan case it is said: "Some of the questions put to the juror Buchanan by counsel for the defendant would, if answered, have been

522

a possible basis for challenge for cause, but the court ruled that these questions when asked of one juror had been asked and answered, and the record shows this to be the case, that is, that the jurors other than Buchanan answered collectively. It is usually better practice to have each juror say for himself whether or not he would answer any of the questions asked of another juror differently from the answers given by the latter. When the jurors are examined *en masse* there is a considerable likelihood of a juror not fully understanding the question and remaining silent, when, should he give an answer, it might show ground for challenge. Also, the reporter might easily be mistaken in concluding that all of the prospective jurors being questioned had responded 'yes,' or 'no,' and yet we cannot say as a matter of law that the method pursued in this case, under the circumstances shown by the record, did not result in the questions asked of juror Buchanan being answered by the others. It is certain that there is nothing to impeach the record which shows that they were answered. In some states it is provided by statute that the examination of jurors in criminal cases shall be directed to 'each juror,' 'any juror,' or 'a juror,' while in other states such limitation applies only to capital cases. It has been held, however, that in the absence of such legislation the examination of jurors is largely within the sound judicial discretion of the trial court. (*Commonwealth* v. *Nye,* 240 Pa. 359 [87 Atl. 585]; *State* v. *McGee,* 80 Conn. 614 [69 Atl. 1059]; *State* v. *Munch,* 57 Mo. App. 207; *Connors* v. *United States,* 158 U. S. 408 [39 L. Ed. 1033, 15 Sup. Ct. Rep. 951]; *Murphy* v. *United States,* 7 Fed. (2d) 85.) It has repeatedly been decided that in jurisdictions where no statutory limitation or restriction of such examination to individual jurors exists, a judgment will not be reversed unless it shall affirmatively appear that the defendant was precluded from interrogating the jurors upon matters not theretofore covered, or that any juror who served was prejudiced or not qualified. (*Nichols* v. *State,* 97 Tex. Crim. Rep. 174 [260 S. W. 1050]; *Murphy* v. *United States,* 7 Fed. (2d) 85; *State* v. *Munch,* 57 Mo. App. 207; *Johnson* v. *State,* 29 Wyo. 181 [211 Pac. 484].) While not intending to encourage this method of examining jurors, we cannot say that its use in this case constituted an invasion

of the defendant's substantial rights to his prejudice.''
As appears from the testimony hereinbefore quoted in the
present case, the court, after interrogating Mrs. Lillehoff
as to whether anything she had heard either from fellow-
jurors or anyone else would influence her opinion as to the
facts of the case on trial, received a negative reply, and
then inquired from the rest of the jurors as to whether they
would answer as Mrs. Lillehoff had answered. The record
shows there was no response. Then the court said: ''I
take it you would all answer the same as she did, then.
Then that ground has already been covered, Mr. Giesler.''
Under such circumstances, the silence of the jury, we be-
lieve, constituted an affirmative answer in the absence of
any affirmative showing to the contrary. Subsequently, the
court inquired of each juror upon entering the box whether
he or she would answer any questions that were asked by
the court or counsel in a different manner than by the
others then sitting in the jury-box. Each juror replied
in the negative. As in the Riordan case, so in the instant
case, we cannot say, as a matter of law, that the method
of examining the jurors here pursued, under the circum-
stances shown in this case, did not result in the questions
asked of Juror Lillehoff being answered by the others;
nor that such method of examination constituted an in-
vasion of the defendant's substantial rights to her preju-
dice. The case of *People* v. *Carmichael,* 198 Cal. 534 [246
Pac. 62], is to be distinguished from the present case, in
that the Carmichael case held it was prejudicial error for
the court to refuse to permit defendant's counsel to ex-
amine prospective jurors as to whether they knew that
the case was tried before; whether the failure of the former
jury to agree would prejudice them against the defendant;
whether they had heard how the former jury stood; whether
such information would prejudice them against the defend-
ant; whether they recognized that evidence might be pro-
duced on the second trial which was not brought out on
the first, and whether knowledge as to how the former jury
stood had left their minds as open and impartial as if
they had never heard of the case. Furthermore, the court
forbade appellant from further mentioning the former jury
to the members of the present jury. No such error was
committed in the case at bar; to the contrary, similar ques-

524

tions were permitted to be asked of the first juror and then the jurors were asked collectively whether they would answer in the same manner. In the case of *People* v. *Wismer*, 58 Cal. App. 679 [209 Pac. 259], cited by appellant, the defendant was compelled to accept a juror who was disqualified by reason of actual bias by reason of the fact that the juror sat in a previous trial of a similar offense and formed an opinion that the organization of which defendant was charged with being a member was an unlawful organization. In the present case, there is no showing that any juror sat in a previous trial of a similar offense, or that such juror had formed any opinion as to the facts in the case on trial, or as to the guilt or innocence of the defendant. Counsel for appellant questioned the jury at length upon whether or not they were, or any one of them was, prejudiced because other jurors had found Paul Kelly guilty of killing appellant's husband, of which crime she was accused of compounding. Moreover, it does affirmatively appear that no juror who sat in the Kelly case acted as a juror in the case on trial.

Appellant next complains that the court erred in admitting in evidence the testimony of appellant's co-defendant, Dr. Walter James Sullivan, given at the coroner's inquest held a day or two after the death of Ray Raymond, which testimony was given without the presence of the defendant and appellant. Appellant contends that such testimony was inadmissible as being hearsay, being a declaration made by an alleged co-conspirator outside the presence of his co-defendant after the termination of the alleged conspiracy; and also that the testimony was in the nature of an admission made without the presence of the conspirator on trial and not in furtherance of the object of the conspiracy. Count II of the indictment charges: "That the said defendants, Dorothy MacKaye Raymond and Dr. Walter James Sullivan, on or about the 19th day of April, 1927, at and in the county of Los Angeles, state of California, after the commission of the said crime, and having knowledge of the commission thereof, did wilfully, unlawfully, and feloniously take and receive the sum and value of five hundred dollars ($500.00), lawful money of the United States, from said Paul Kelly, upon the agreement and understanding had with said Paul Kelly

to compound and conceal the said crime of murder aforesaid, so committed by the said Paul Kelly, and to withhold evidence thereof, and to abstain from any prosecution thereof, and that in pursuance of said agreement and understanding, the said defendants Dorothy MacKaye Raymond and Dr. Walter James Sullivan, did then and there inform and say to one Frank H. Schoeffel, who was then and there a deputy coroner of the said Los Angeles county, that the said Raymond had died of natural causes alone, and that the body of said Raymond bore no signs of physical injury or of violence and that the said Ray Raymond had died of acute alcoholism with neuritis and Bright's disease.'' The testimony of Dr. Sullivan so admitted and complained of by appellant contains statements tending to prove appellant had concealed from Dr. Sullivan at the time he was called to attend decedent the fact that decedent had been in a fight at his home and with whom. It contained an answer given by the doctor to the effect that the reason he did not issue the death certificate was that when he called the coroner's office he did not wish to do so until he had heard from appellant; that appellant told him to use his own judgment, if he didn't think there was a skull fracture. He was asked the following question, and gave the following answer, which was read into the record: ''Q. Didn't Mrs. Raymond tell you that she didn't want any publicity about this case? A. Yes, on the morning that he died she said that she didn't want any.'' Conceding, without deciding, that the admission of the doctor's testimony given before the coroner's jury was error, such error was cured by the testimony of Dr. Sullivan, given as appellant's witness at the trial, when he testified as to those matters to which he had testified at the coroner's inquest. The witness testified on direct as follows: ''Q. Miss MacKaye did tell you the first time when you called on Sunday that he had a fight? A. Yes, sir. Q. Did she tell you with whom? A. I asked her with whom and she said she didn't know.'' The witness was further interrogated, and answered as follows: ''Q. Now, there has been introduced here a transcript of the coroner's testimony of yourself, and there is one answer I would like to have you look at and explain what that was or what it means, if anything. Page 24, Mr. Murray, line 4. Have you read that answer?

A. Yes, sir. Q. Did you give that answer as it is written there or not? A. I don't recall giving it exactly that way. I think I misspoke the name there. Q. I will read you this question and answer: 'Q. Did you issue a death certificate? A. Well, when I called the coroner's office, I didn't want to go on until I heard from Miss MacKaye and Miss MacKaye said to use my own judgment, if I didn't think there was a skull fracture, and about that time the Chief of Police of Hollywood called up and I made up my mind to sign nothing until you people had taken charge of the body.' Did you rely at all upon the judgment of Miss MacKaye as to what was the matter with Mr. Raymond? A. No, that was in reference to the Coroner's office. I think I misspoke the word 'Miss MacKaye' for the Coroner's office; there is no connection whatsoever.'' The witness further testified on direct examination: ''Q. Did she at any time, directly or indirectly, seek to have you hush up or to cover up the cause of death? A. No, sir. Q. Or anything of that character? A. No, sir. There was one time she said something about publicity, and I have been trying to recall the exact date of that, but when she was talking about that she stated that Mr. Raymond was very popular and very prominent and I think I testified at the Coroner's inquest that was the day he died. As I recall that was preparatory to that and in reference to the hospital when she said he was very prominent and very popular and she hoped he wouldn't have a lot of publicity.'' On cross-examination the witness testified as follows: ''Q. Did Miss MacKaye tell you that she didn't want any publicity about the case, Doctor? A. Yes, sir.'' Appellant cites *People* v. *Oldham*, 111 Cal. 648 [44 Pac. 312], as holding that error in admitting the declarations of a co-conspirator made after the commission of the crime as to the details of the crime, is not cured by the fact that such co-conspirator testified to the same statements. The Oldham case is to be distinguished from the instant case in that in the Oldham case the witness testified as a witness for the prosecution, while here the witness testified as a witness for the defendant and appellant. Here the error, if any, was cured by the appellant herself in calling Dr. Sullivan to the witness-stand and having him testify in her behalf to the same matter concerning which he had testified before the coroner's

jury. It follows that whether the evidence was competent or incompetent, appellant cannot now complain.

Appellant attacks the rulings of the trial court in admitting in evidence the declarations and statements of Drs. Sullivan and McHugh made at the autopsy held on the afternoon of the day of decedent's death, and subsequently a telephone conversation with the deputy coroner, alleged in the charging part of the indictment, upon the same grounds that she complains of the rulings of the trial court in admitting in evidence the declarations and statements given at the autopsy. The testimony to which objection is taken was given by Dr. A. F. Wagner, autopsy surgeon, and L. P. Ball, his assistant. In that case, the error, if any, committed by the trial court in admitting such testimony was cured by the testimony of Dr. Sullivan and Dr. McHugh, offered on the part of the defense.

█ Appellant contends that the trial court erred in giving an oral instruction on the question of the belief of jurors in circumstantial evidence. After the jury had retired for deliberation they returned to the court for further instructions, when the following proceedings occurred at 4:37 P. M.: "The Court: Ladies and gentlemen, I understand that you want some further advice or instructions of some kind? A Juror: Yes, sir. We want further advice along what is considered as circumstantial evidence. The Court: Well, I can't give you any further instructions than I have on that, because that is all there is to the definition of circumstantial evidence, that it is any other evidence than the evidence of a direct eye-witness. In other words, it may consist of declarations made by the parties, circumstances that have been developed in the evidence in any particular case, anything that is in evidence before you other than the testimony of a direct eye-witness. Circumstantial evidence includes everything but that, and that is as far as I can go on an instruction of that kind, because that is all there is to it. Any other questions that you have? The Juror (to another juror): If you want to ask your question, go ahead and ask it. Another Juror: We don't know whether we would be permitted to ask that question. The Court: You can always ask, you know. I may not be permitted to answer it, but I can't tell until I know what it is you want. What is it you want to know? Go

ahead and ask any question that you want to, ladies and gentlemen. Of course, as I say, it may be a question I am not permitted to answer. The Juror: Judge, if one is opposed to circumstantial evidence, don't believe in it, what then? The Court: If anyone of this jury takes that attitude then they have committed perjury, because you have sworn to try the case according to the evidence, and if anyone takes that view they haven't any business on this or any other jury. Jurors are supposed to be people of sound minds and to be able to understand the instructions of the court and to abide by them. Now, are there any other questions? A Juror: No. The Court: You know, you might find people on the jury who are opposed to the doctrine that the earth is round, but you are supposed to be people of ordinary intelligence and to understand instructions and act upon them intelligently. You heard the oath when you were asked as to your qualifications." Subsequently the court stated: "Now, I want to give you folks all the time you need. Of course this case has taken a long while, and I want you to have all the time you need, and if you haven't agreed on a verdict, why, we will say, half past five, then I will hear from you tomorrow morning. But don't think the court is going to hurry you in any way. You are entitled to all the time you want. If you need the time, take all that you need." Thereupon the jury retired for further deliberation, and at 4:50 P. M. returned a verdict.

Appellant urges that language such as here used could have no other effect than to intimidate and coerce the juror and cause him to bow his will to that of the majority because of his fear of the consequences. It is urged that it would have been much more proper for the court to have ascertained what was in the mind of the juror and to have fairly and succinctly explained to him the value of circumstantial evidence and its construction in the eyes of the law, rather than to have told him that he was guilty of perjury and questioned intelligence and not fit to serve on this or any other jury. Appellant further contends that the speed with which the verdict was returned should be indicative of the harm done by such language. It is to be conceded that the remarks of the court could have been expressed in less direct terms; but we have here to determine only

whether the language as used constituted reversible error. The question itself disclosed what was in the mind of the juror, and in our opinion the reply of the court was not a misstatement of the law. It was not within the right of any juror to oppose circumstantial evidence, or refuse to consider it, and so to do constituted a violation of his oath as a juror. The jurors were sworn to answer such questions as might be propounded to them touching their qualifications to sit as jurors in the case and were asked: "Would all of you, do you think, be able to base your verdict on the evidence as you receive it here in court and upon the instructions of the court, and nothing else? (Various members of the jury answered in the affirmative.)" The jury was instructed as to the law of circumstantial evidence as follows: "There are two classes of evidence recognized and admitted in courts of justice, upon either of which juries may lawfully find an accused guilty of crime. One is direct evidence, which is the direct testimony of an eye-witness to a transaction, and the other is circumstantial evidence, which includes all evidence other than that of an eye-witness. Such evidence may consist of statements by defendant, plans laid for the commission of the crime; in short, any acts, declarations or circumstances admitted in evidence tending to connect the defendant with the commission of the crime. There is nothing in the nature of circumstantial evidence which renders it less reliable than the other class of evidence. One may as well swear falsely to an absolute knowledge of the facts as to a number of facts from which, if true, the facts on which the guilt or innocence depends must inevitably follow. If upon consideration of the whole case you are satisfied to a moral certainty and beyond a reasonable doubt of the guilt of the defendant, you should so find, irrespective of whether such certainty has been produced by direct evidence or circumstantial evidence. The law makes no distinction between circumstantial evidence and direct evidence in the degree of proof required for conviction, but only requires that the jury shall be satisfied beyond a reasonable doubt by evidence of either the one character or the other, or both." Section 118 of the Penal Code reads: "Every person who, having taken an oath that he will testify, declare, depose, or certify truly before any competent tribunal, officer, or

person, in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states as true any material matter which he knows to be false, is guilty of perjury.'' In the case of *In re De Martini*, 47 Cal. App. 228 [190 Pac. 468], it is said: ''The oath of a prospective juror on his *voir dire* examination binds him, under the pains and penalties of perjury, to truthfully answer the questions that may be propounded to him by either court or counsel. The language of section 118 of the Penal Code is certainly broad enough to include the offense of perjury when committed by a prospective juror upon his *voir dire* examination, and to hold otherwise would certainly be to open the door wide to all forms of collusion in the selection of jurors, if false answers knowingly and corruptly made under such circumstances can be given with impunity.'' ■ After a juror has answered under oath that he will base his verdict on the evidence and on the instructions of the court, and after the court has instructed him on the value and effect of circumstantial evidence, the juror cannot consistently say at the time he is deliberating with his fellow-jurors on a verdict, that he is opposed to and does not believe in circumstantial evidence. A false statement concerning such a fact, when made by a prospective juror under examination, constitutes perjury. And under the circumstances existing in this case, the court had the right to use the language necessary to convey such information to the jury, when requested by a member of the jury, as in this case. The cases cited by appellant in support of her claim that the trial court should not say or do anything which might bring to bear upon the jury an influence not compatible with an unbiased verdict, are cases where the court commented on the weight of the evidence, or the credibility of a witness. In one case relied upon by the appellant, the court referred to the deceased as the ''victim.'' (*People* v. *Williams*, 17 Cal. 142.) In *People* v. *Matthai*, 135 Cal. 442, 449 [67 Pac. 694], the court gave an instruction erroneously stating the facts; in *People* v. *Frank*, 71 Cal. App. 575 [236 Pac. 189], the court recommended to the jury the high standing of two prosecuting witnesses; in *People* v. *McDonald*, 167 Cal. 545 [140 Pac. 256], the trial court stated that a witness for the prosecution had been courteous, kind, and

modest; in *People* v. *Derwae,* 155 Cal. 592 [102 Pac. 266], the district attorney persisted in asking improper questions of the defendant. In the case of *People* v. *Mahoney,* 201 Cal. 618 [258 Pac. 607], the supreme court said: "When, as in this case, the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense, it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary." And in *State* v. *Tulip,* 9 Kan. App. 454 [60 Pac. 659], the following proceedings occurred: "What are we going to do with a man who claims. he don't believe any of the witnesses at all? Court: I suppose you can argue with him. That is all I know to do. I don't suppose there is any man but who will act with some reason. . . . I put you in the box because you are twelve decent, sensible men; and I presume you will act that way, and I don't presume anything to the contrary. If you ask me what you are going to do with any man who acts the fool —But I don't suppose that you are, any of you, that kind of men. I suppose that you are twelve honest, conscientious men, and will act conscientiously according to your best judgment." In each of the foregoing cases the trial court commented on the weight of the evidence, or credibility of witnesses, except that in one case the district attorney was guilty of misconduct. In the present case there was neither comment on the evidence nor on the credibility of witnesses. While we do not fully approve of the language employed by the trial court in conveying its ideas to the jury, yet we cannot say that we find any prejudicial error therein.

■ Appellant next urges that the court erred in refusing to instruct the jury that if they found that Paul Kelly was responsible for the death of Ray Raymond, but that his act constituted manslaughter and not murder, that they should find the defendant not guilty, and in giving and submitting to the jury a verdict in the form of the one returned against this defendant. Count II of the indictment reads as follows: "For a further and separate cause of action, being a different offense of the same class

532

of crimes and offenses and connected in its commission with the offense set forth in count I hereof, the said Dorothy MacKaye Raymond and Dr. Walter James Sullivan are accused by the Grand Jury of the County of Los Angeles, State of California, by this indictment, of the crime of compounding a felony, a felony, committed at and in the County of Los Angeles, State of California, and before the finding of this indictment as follows, to-wit: That on or about the 19th day of April, 1927, at and in the County of Los Angeles, State of California, one Paul Kelly did wilfully, unlawfully and feloniously and with malice aforethought kill and murder one Ray Raymond, a human being; that the said defendants, Dorothy MacKaye Raymond and Dr. Walter James Sullivan, on or about the 19th day of April, 1927, at and in the County of Los Angeles, State of California, after the commission of the said crime, and having knowledge of the commission thereof, did wilfully, unlawfully and feloniously take and receive the sum and value of Five Hundred Dollars ($500.00), lawful money of the United States, from said Paul Kelly, upon the agreement and understanding had with said Paul Kelly to compound and conceal the said crime of murder aforesaid, so committed by the said Paul Kelly, and to withhold evidence thereof, and to abstain from any prosecution thereof, and that in pursuance of said agreement and understanding, the said defendants Dorothy MacKaye Raymond and Dr. Walter James Sullivan, did then and there inform and say to one Frank H. Schoeffel, who was then and there a deputy coroner of the said Los Angeles County, that the said Raymond had died of natural causes alone, and that the body of said Raymond bore no signs of physical injury or of violence and that the said Ray Raymond had died of acute alcoholism with neuritis and Bright's disease; whereas in truth and in fact the body of the said Ray Raymond showed numerous marks and bruises and other evidence of violence and the death of the said Ray Raymond was caused by injuries received by reason of blows struck said Ray Raymond by the said Paul Kelly as aforesaid. Contrary to the form, force and effect of the statute in such cases made and provided and against the peace and dignity of the People of the State of California." The court instructed the jury as follows: "You are instructed, that if you believe from

the evidence beyond a reasonable doubt, that on or about the 19th day of April, 1927, at and in the County of Los Angeles, State of California, one Paul Kelly did kill one Ray Raymond, a human being, and that in so doing said Paul Kelly was guilty either of murder or of manslaughter, and that the said defendant, Dorothy MacKaye Raymond, and Dr. Walter James Sullivan, on or about the 19th day of April, 1927, at and in the County of Los Angeles, State of California, after the commission of the said crime, and having knowledge of the commission thereof, did wilfully, unlawfully, and feloniously take and receive the sum and value of Five Hundred Dollars ($500.00), lawful money of the United States, from said Paul Kelly upon the agreement and understanding had with said Paul Kelly, to compound and conceal the said crime aforesaid, so committed by the said Paul Kelly, or to withhold evidence thereof, or to abstain from any prosecution thereof, you should find the defendant, Dorothy MacKaye Raymond, guilty as charged in Count II of the indictment.'' The jury returned the following verdict: ''We, the jury in the above entitled action, find the defendant guilty of compounding a felony, to-wit: Manslaughter, a felony, as charged in the indictment.'' Appellant urges that there are no degrees in the crime of compounding a felony; that since the prosecution elected to accuse the defendant with the crime of compounding a murder, it was incumbent upon them to establish that offense; that the jury has found that the preceding crime necessary to conviction, to wit: murder, has not been committed, nevertheless they have proceeded to convict the defendant, and returned a verdict provided to them by the court for a different offense than charged in a manner not provided by law. It must be conceded that there is considerable force to the argument of appellant, yet no case directly in point is cited; nor have we been able to find any case holding that a defendant charged with the crime of compounding the crime of murder may not be convicted of compounding the crime of manslaughter, a lesser crime necessarily included in the crime of murder. As stated by appellant, it has been held in this state that manslaughter is a distinct crime (*People* v. *Huntington*, 8 Cal. App. 612 [97 Pac. 760]), and that a verdict of manslaughter acquits the defendant of murder. (*People* v.

*Smith,* 134 Cal. 453 [66 Pac. 669]; *Huntington* v. *Superior Court,* 5 Cal. App. 288 [90 Pac. 141].) It has also been held that the offense of manslaughter is included in the charge of murder. (*People* v. *Muhlner,* 115 Cal. 303, 305 [47 Pac. 128]; *People* v. *Cyty,* 11 Cal. App. 702, 706 [106 Pac. 257].) Section 1159 of the Penal Code provides: "The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." It follows that if appellant had been placed on trial for the crime of murder and had been found guilty of the crime of manslaughter, she could not complain. We see no difference from the foregoing in the case at bar. Where, as in this case, the indictment charges the crime of murder as having been compounded and concealed and the proof shows that it was the crime of manslaughter that was compounded and concealed, the defendant is in no way prejudiced thereby, since the crime of manslaughter is necessarily included in the crime of murder. An examination of the indictment fortifies our conclusion. The indictment charges defendants with compounding a felony, after the commission of the crime of murder of Ray Raymond by Paul Kelly; "having knowledge of the commission thereof, did wilfully, unlawfully, and feloniously take and receive the sum and value of Five Hundred Dollars ($500.00), lawful money of the United States, from said Paul Kelly, upon the agreement and understanding had with the said Paul Kelly to compound and conceal the said crime of murder aforesaid, so committed by the said Paul Kelly." We believe the gist of the charge to be that defendants having knowledge of the wilful, unlawful, and felonious killing of Ray Raymond by Paul Kelly, did unlawfully take and receive from Paul Kelly the sum of $500 upon the agreement with Paul Kelly to compound and conceal the said unlawful and felonious killing. The gravamen of the offense consists in stifling public prosecution, or in some way perverting public justice. (12 Cor. Jur., p. 305.) An indictment for compounding a crime, as for crimes generally, must contain a statement of acts constituting the offense in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended. (*People* v. *Byron,*

103 Cal. 675 [37 Pac. 754]; Pen. Code, sec. 950.) In section 153 of the Penal Code it is provided as follows: "Every person who, having knowledge of the actual commission of a crime, takes money or property of another, or any gratuity or reward, or any engagement, or promise thereof, upon any agreement or understanding to compound ' or conceal such crime, or to abstain from any prosecution thereof, or to withhold any evidence thereof, except in the cases provided for by law, in which crimes may be compromised by leave of court, is punishable as follows: 1. By imprisonment in the state prison not exceeding five years, or in a county jail not exceeding one year, where the crime was punishable by death or imprisonment in the state prison for life; 2. By imprisonment in the state prison not exceeding three years, or in the county jail not exceeding six months, where the crime was punishable by imprisonment in the state prison for any other term than for life; 3. By imprisonment in the county jail not exceeding six months, or by fine not exceeding five hundred dollars, where the crime was a misdemeanor." In view of the provisions of section 1159 and section 153 of the Penal Code, we conclude that in the case at bar the indictment does contain a statement of facts in ordinary and concise language constituting the offense of compounding the crime of murder, or of any crime necessarily included in the offense of compounding the crime of murder, including manslaughter, and in such manner as to enable a person of common understanding to know what is intended. In our opinion, the offense of compounding the crime of manslaughter is a lesser offense necessarily included in the charge of compounding the crime of murder. The conviction of the lesser offense of compounding the crime of manslaughter was an acquittal of the charge of the greater offense of compounding the crime of murder, and was a bar to further prosecution of the charge of compounding the crime of murder. So that defendant was not prejudiced by such conviction. It follows that no error was committed by the trial court in giving the instruction and submitting the verdict authorizing the jury to find the defendant guilty of compounding the crime of manslaughter.

Finally, appellant claims that the evidence is legally insufficient to sustain the verdict. We have reviewed the

entire evidence, and while there is much conflict, we believe the evidence offered by the prosecution, as heretofore outlined, is sufficient to support the verdict. The evidence offered by the prosecution tended to prove that appellant and Paul Kelly were associating in intimate relations; that appellant frequently had differences with her husband, Ray Raymond, concerning these relations; that Ray Raymond had ordered Paul Kelly to stay away from his home; that appellant was in Paul Kelly's home on many occasions both before and after Ray Raymond's death; that Kelly telephoned to Raymond while appellant was present in Kelly's home, and immediately Kelly went to Raymond's house and beat Raymond up so severely that the blows delivered by Kelly resulted in Raymond's death; that appellant called her co-defendant, Dr. Sullivan, to attend Raymond; that upon Raymond's death Dr. Sullivan had a conference with appellant and she then made payment of his bill for medical services, which was the sum of $500, the money being furnished by Paul Kelly, with whom appellant had been in conference after the death of Raymond; that appellant and Dr. Sullivan were seeking to avoid publicity in regard to the cause of Raymond's death; that Dr. Sullivan concealed from the coroner the fact that Raymond had been injured in the fight. These facts, together with other evidence of the prosecution, justified the jury in concluding that Ray Raymond met his death as a result of the blows struck by Paul Kelly, and that appellant committed the crime of compounding a felony, to wit, manslaughter, after the commission of said crime and having knowledge thereof, in wilfully, unlawfully, and feloniously taking and receiving the sum and value of $500 from Paul Kelly upon the agreement and understanding had with said Paul Kelly to compound and conceal the said crime and withhold evidence thereof and abstain from any prosecution thereof.

After the examination of the entire cause, including the evidence, we cannot say that the errors complained of resulted in a miscarriage of justice.

The judgment and order denying the motion for a new trial are affirmed.

Conrey, P. J., and York, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 9, 1928.

All the Justices concurred.