[Crim. No. 156. Fourth Appellate District.—February 21, 1934.]

THE PEOPLE, Respondent, v. HENRY ZINGARELLI, Appellant.

B. W. Gearhart, Louis J. Coelho and Lindsay & Gearhart for Appellant.

U. S. Webb, Attorney-General, Glenn M. Devore, District Attorney, and Rae B. Carter, Deputy District Attorney, for Respondent.

BARNARD, P. J.—On the night of January 6, 1933, or the early morning hours of January 7th, about seven tons of raisins were stolen from a vineyard in Fresno County, owned by the Wishon-Watson Company. Sixty-seven boxes of raisins had been emptied and ten boxes were missing. On the soft earth were found the imprint or impressions of certain well-known automobile tires, indicating that an eight-wheel truck and an ordinary passenger car had been used in connection with removing the raisins. From the tire marks the officers were able to name the make of tire that had been on each respective wheel of the truck and automobile thus used. Plaster casts were taken of the tire marks or impressions and, a little later, it was ascertained that the truck and automobile used on that occasion were, in fact, owned or possessed by the defendant Zingarelli. When the truck was found at this defendant's home, raisins of the same variety as those stolen were found in the cracks on the body of the truck. At first this defendant denied any knowledge of the matter under investigation and told the officers that he had never loaned his truck to anyone and that no one but himself had ever driven it. After being confronted with the plaster casts of the tire marks, he told the officers that on the night the raisins were stolen he had loaned the truck to one Leo Moreno. Zingarelli and Moreno were jointly charged with grand theft, were separately represented by counsel and, at the trial, each endeavored to pin the theft

upon the other. The jury was unable to agree as to the defendant Moreno, but found the defendant Zingarelli guilty, and he has appealed from the judgment and from an order denying his motion for a new trial.

 It is first urged that the court erred in denying a motion made by the appellant for the discharge of the entire jury panel. The information filed had also charged the appellant with a prior conviction of a felony, which charge had been admitted by him upon arraignment. While the jury was being chosen, counsel for Moreno started to ask a prospective juror a question as follows: "If it appears from the evidence that Mr. Zingarelli has been previously convicted of a felony—." Interrupting the question, the appellant's counsel cited the same as prejudicial misconduct and asked that the jury be advised to disregard it, and the court so instructed the jury. Thereupon, the district attorney stated that since filing the information he had learned that the previous conviction referred to had not been for a felony, but for a lesser offense, and moved to dismiss that portion of the charge. Thereupon counsel for the appellant stated that the previous charge was only a boyhood fight which had resulted in the appellant being sent for a few months to Preston, that the way the case was determined it was no offense at all, that by reason of this interjection by counsel for the other defendant the appellant had been prejudiced, and, after thanking the district attorney for his very fair statement of the matter, asked that the entire panel be discharged and a new panel summoned. The court denied the motion, but instructed the jury to disregard everything in connection with the matter thus brought to its attention.

If this motion be considered a challenge to the panel it was properly denied, since a challenge to a panel can be founded only on a material departure from the prescribed forms for drawing and returning a jury (Pen. Code, sec. 1059; *People* v. *Giminiani*, 76 Cal. App. 352 [244 Pac. 625]; *People* v. *Raymond*, 87 Cal. App. 510 [262 Pac. 442]). Had this information been so prejudicial it could not be cured by the court's instruction, it would have been ground for a challenge for cause as to each member of the panel who heard it. But the appellant neither attempted to challenge any prospective juror for such cause nor exhausted his peremptory challenges. As a practical matter, while the

question was improper, a similar question would have been proper for impeachment purposes when the appellant took the stand, as he later did. In fact, no more injury could have resulted than would have resulted from a proper question later on. Any possible injury, after being minimized by the explanation of the district attorney and the statement made by appellant's counsel, was cured by the instruction given, and it is not reasonable to believe that the incident affected the verdict. It should also be remembered that the question was asked not by the district attorney, but by a co-defendant, and it should require a substantial showing of prejudice to permit verdicts in criminal cases to be overthrown by the actions of a co-defendant which are beyond the control of the prosecution and which might even be done deliberately for the purpose of upsetting any verdict. After examining all of the record, we are of the opinion that no miscarriage of justice has occurred and that a reversal is not required because of what happened in this connection.

What appears to be the main point relied upon for reversal is that the court abused its discretion in denying a motion for a new trial on the ground of newly discovered evidence. This point requires a somewhat lengthy consideration. The principal defense of the appellant was that of an alibi. In support thereof he testified that on the evening of January 6, 1933, he and his family had dinner at the home of his father; that he spent the evening there with a number of other relatives; and that about 10 o'clock on his way home he took an uncle and aunt to their home. This uncle, possessed of a long and difficult name, was throughout the trial referred to as "Joe" and will be herein thus designated. The appellant testified that as they parted at the uncle's house Joe asked him to go with him early the next morning, before they both had to go to work, to get a load of olive-pits for fuel; that he agreed to use his truck for this purpose; that shortly after he got to his own home the defendant Moreno came and asked to borrow his truck, stating that he desired to go into the country to get some barrels of whisky; that Moreno also asked to borrow his automobile to the end that only one of the men involved would be caught in the event the officers interfered with the enterprise; that he objected at first, but changed his mind and loaned Moreno the truck and automobile; that he was awakened soon after

4 the next morning by Joe, who told him it was time to go for the olive pits; that he told Joe he could not go because he had loaned the truck and it was not yet back; that Joe did not believe him and he arose and went out and showed him that the truck was gone; that Joe then left and he went back to bed and slept until about 7, when he was aroused by another man who had come to take him to his work; that he then found the truck had been returned and noticed there were some raisins on it; that he went over to Moreno's place, about a block away, and accused Moreno of deceiving him by hauling raisins on the truck when he had borrowed it only for the purpose of transporting whisky; and that he then returned home and went with the other men to his work.

The uncle, Joe, testified that he quit work at 6 o'clock on the night of January 6th and immediately after supper went to the home of the appellant's father; that certain relatives were there, including the appellant and the appellant's brother, Frank; that the appellant took him home about 10 o'clock, at which time they made an appointment to go after olive pits the next morning; that soon after 4 the next morning he went to the appellant's house, found him asleep and roused him; that he doubted the statement that the truck was not there and the appellant got up and showed him that it was gone; that he then left, as he had to be at his work at 6 o'clock; that during this period he was working day times at an olive oil factory; and that on January 6th and also on January 7th he worked there from 6 in the morning to 6 at night. When asked on cross-examination, if he was certain that he worked at that place all day on January 7th he replied that he was and that they could call his boss to prove that fact. Thereupon the district attorney sent for the proprietor of the olive oil factory. After he came Joe talked to him and the next morning he took the stand for the purpose of correcting his testimony, given the day before, whereupon he testified that he had refreshed his memory and looked at the time-book and discovered that he had not worked on January 7th. However, he stated that he went to the plant on the morning of the 7th and finding there was no work to be done, waited there until 11 o'clock. He also stated that he had talked to his employer, who told him that the district attor-

ney had been over to see about when he had worked, and that his employer had shown him from his time-book that he had worked on January 4th, 5th and 6th, but not on January 7th and 8th. Joe's employer was then called as a witness for the appellant and testified that Joe had worked on January 3d, 4th, 5th and 6th, but that he had not worked on January 7th or 8th. The employer testified that he only had three men working on the day shift and three other men on the night shift at the time, and that the men knew when they left on one day whether or not they were to come back the next day. However, on cross-examination, Joe's employer testified that during that week Joe was working on the night shift and that he worked from 6 o'clock on the night of the 6th to 6 o'clock on the morning of the 7th.

On motion for a new trial affidavits were introduced to the effect that this employer would now testify that he made a mistake when he testified that Joe worked on the night of January 6th; that in fact he fired him after the night of January 5th; and that he did not work at all on the 6th, 7th or 8th. The appellant contends that Joe's testimony as to finding the appellant asleep shortly after 4 o'clock on the morning of the 7th, at which time the truck was not on the premises, was the very foundation of his defense; that this defense was blasted by the unexpected testimony of his own witness, the employer, to the effect that Joe was working at the olive oil plant all of that night; that this employer later discovered that this testimony was a mistake; and that it was an abuse of discretion to refuse a new trial in order to permit that mistake to be corrected.

It should first be observed that it is not too apparent that a mistake was made. The employer testified that he had only three men on the day shift and three men on the night shift, and he stated that he could remember which men were on the respective shifts and that, being so few, it was impossible for him to make a mistake. His time-book was introduced in evidence and he had this before him at the time he testified. From this he testified that Joe worked all of the night of the 6th to 6 o'clock on the morning of the 7th. The time-book which was introduced in evidence shows that Joe was credited with fourteen hours on January 2d, twelve hours on January 3d, twelve hours on January 4th, twelve hours on January 5th, and twelve hours

on January 6th. On the time-book there is a line drawn between the entry for January 5th and the one for January 6th, and opposite January 7th is written "Pd." According to the offer of newly discovered evidence the employer now wishes to testify that the line between January 5th and January 6th indicates that he discharged Joe at that time. The presence of the figure "12", indicating twelve hours on January 6th is not explained nor is the fact that the notation "Pd." is below that entry. The offer itself is far from convincing and the trial court may well have considered this as merely an attempt on the part of the witness not only to impeach his own testimony, but to place an interpretation on the entries in the time-book not justified by the record itself.

Even if the newly discovered evidence thus relied on were to be received, the fact would still remain that this employer's testimony would still impeach the statement made by Joe to the effect that he quit work at 6 o'clock on the evening of January 6th, and also his statement that after he aroused the appellant early on the morning of the 7th he left and went to his work as he had to be at his work at 6 o'clock, and also his statement that during all of that week he had worked on the day shift. Joe was also impeached by a statement made by the appellant's brother, Frank, who told the officers immediately after the appellant's arrest that on the evening of the 6th the appellant left his father's home immediately after supper, going away in his automobile and that he did not see him again until the next morning, although Joe testified that the brother Frank and the appellant were present at the father's home all of that evening.

The appellant urges that the motion for a new trial should have been granted because, without the asserted mistake of the employer referred to, the jury could not have believed the appellant guilty of the charge. Not only was the evidence of an alibi greatly shaken by evidence other than that sought to be corrected, some of which we have referred to, but the other evidence is ample to justify the action of the jury. The appellant admitted and stipulated that the raisins in question were hauled in his truck. There was other evidence that about that time he asked permission of a man named Costa, at whose house Moreno was staying, to

store raisins in his garage and that a few mornings later, when Costa arose, he found these raisins in the garage; that the appellant, with two Mexicans helping him, was seen working in this garage dumping the raisins from one set of boxes to another, at a time when Moreno was not there; and that when the raisins were sold the appellant received all of the money with the exception of $10. Certain phases of the story told by the appellant would tax the credulity of any jury. He stated that he did not want to loan his truck and car to Moreno, but consented after being told that a car was also needed in order that only one man would be involved in case the truck was taken by the officers. That this explanation should be satisfactory when he must have known of the danger that his truck would be confiscated in that event, is hard to believe. It seems rather unusual to thus loan the truck immediately after having promised its use to another, and this without even notifying the first man, who was only about a block away. It also seems strange that when he was awakened by his uncle the next morning shortly after 4 o'clock, he knew the truck was not back before he had looked. Another strange incident is that when he was aroused about 7 o'clock that morning by the men who were to take him to his work, and in the few minutes they allowed him to get ready to go, he discovered there were raisins on the truck and became so much excited over the idea that they had used the truck for hauling raisins instead of whisky that he went immediately to Moreno's home to upbraid him for having deceived him, and then, although he had found raisins on the truck and saw a large quantity of raisins in the garage at Moreno's home, that he immediately accepted Moreno's story that he had brought in one small box of raisins for the children, and did not for a moment suspect that the larger quantity of raisins in the garage had also been hauled on his truck.

While the appellant insists that from beginning to end he told the same story, the record shows the contrary. He first told the officers that he knew nothing of the matter under investigation and that he had not loaned the truck to anyone else. After being confronted with evidence which he could not meet, he changed his story and thereafter insisted that he had loaned the truck to Moreno. A number

of inconsistencies appear in his second story. He told the officers that when he went to see Moreno on the morning of the 7th, after discovering raisins on the body of his truck, he found Moreno in the garage filling boxes with raisins and that Moreno then told him to keep his mouth shut as the trouble was all over. While on the witness-stand he stated that on this occasion he found Moreno in the house, that Moreno took him in and showed him a small box of raisins which he said was all he had brought, and that as he left he saw other raisins in the garage and some Mexicans filling the boxes. Altogether the record shows that he changed his story four times with reference to where Moreno was on this occasion and what he was doing. Again, he stated that he loaned some of his boxes to Moreno because he expected to buy the raisins himself. Later he testified that he loaned the boxes to Moreno, but told him that if he sold the raisins to a warehouse not to sell them in his boxes as he wanted to use them soon. At another time he testified that when he loaned the boxes to Moreno he told him not to sell the raisins in his boxes because "my box they are known in the packing house".

We have not attempted to summarize all of the evidence, but we think the above is sufficient to show that under the state of the record the court was justified in closely examining the proffer of newly discovered evidence and that, in view of all of the facts, it cannot be said that the denial of the motion was an abuse of discretion.

■ The appellant attacks one instruction, reading as follows:

"All persons concerned in the commission of a crime, whether it be a felony or a misdemeanor, whether they directly commit the act constituting the offense or aid and abet in its commission, are principals in any crime so committed.

"You are therefore instructed that where a person stands by and aids, assists or encourages in. the perpetration of a crime, he is just as guilty as the person who does it and is to be treated as a principal, so that if you believe beyond a reasonable doubt and to a moral certainty from all the evidence, circumstances and facts in this case that either or both of these defendants merely aided, abetted or encouraged the stealing of the personal property described in

the information, then you should find these defendants guilty as charged in the information.''

It is argued that this instruction authorized the jury to find the appellant guilty even if it merely believed that he innocently aided the other defendant by loaning him a truck, and also that it authorized the jury to find the appellant guilty if it believed that the other defendant aided, abetted or encouraged someone else in the stealing, although the appellant had nothing whatever to do with it. While the instruction is not perfectly worded, the interpretation placed upon it by the appellant is so subtle and remote that he deemed it necessary, in his brief, to present it with an elaborate system of underlining and diagramming in red pencil, in order that the court might see the points raised. It is neither to be assumed that the jury would make such a microscopic analysis of the language used nor accept it as an authorization to find guilty a defendant whose participation in the crime, if any, was entirely innocent. In view of the ample evidence of the appellant's guilt, it is inconceivable that the jury based its verdict upon the construction which the appellant now places upon this instruction. The jury was also instructed that one of the defendants could be found guilty and the other not guilty, and all of the instructions taken together are such that the jury must have understood that either or both of the defendants were to be found guilty only in the event it was convinced that any defendant found guilty had aided or abetted in the actual commission of the crime.

It is next urged that the district attorney was guilty of deliberate and wilful misconduct in asking the witness Joe the following question: ''Very well, Joe, in the various times that the Zingarelli family have been in court, you have been in court with them, supporting them with your testimony, haven't you?'' The district attorney first stated that he would ask the question for the purpose of impeachment. An objection to the question was sustained by the court. Counsel for the appellant then asked the court to instruct the jury to disregard the statement and the question. The court replied: ''Of course, there is nothing in the record.'' Counsel again asked that the jury be instructed to disregard the question. The court replied:

"Well, I don't think there is anything that justifies the Court in instructing the jury. The question was asked and the objection sustained. There is nothing before the jury." However, the court did later instruct the jury to disregard all statements of counsel and not to draw any conclusions or inferences from questions propounded by counsel and ruled out by the court. While we think the question was improper, even for impeachment purposes, we think the court's ruling and instructions sufficiently protected the interests of the defendants and that the matter is not sufficiently prejudicial to justify a reversal, especially when taken in connection with all of the facts appearing in the record.

■ The last point raised is that the district attorney was guilty of misconduct in that his prosecution of the defendant Moreno was not conducted with as much zeal as was his prosecution of the appellant. It is argued that the district attorney indulged in facial expressions, tones of voice, gestures and other theatrical effects which disclose that his prosecution of Moreno was unreal and insincere, and which were designed and calculated to secure conviction of the appellant alone. We regard this point as utterly without merit. While the theatrical effects complained of may not be perfectly presented in the record for our review, we find nothing in the record to indicate that the district attorney failed in any respect to present to the jury any evidence of which he had knowledge, which would throw any light upon Moreno's connection with the crime in question.

We are unable to see how the jury could have arrived at any other verdict with reference to the appellant. The evidence presented against him by the prosecution was strong and any possible doubt left by the same must have been completely removed by the nature of the evidence given by and on behalf of the appellant. His own story should convince any juror that he was not telling the truth and his defense of an alibi was thoroughly discredited. This is true, even if the testimony of his employer that Joe was working on the night of January 6th, which it is now claimed was a mistake, be entirely eliminated from the case. In view of the evidence, it does not seem possible that the verdict could have been affected by the matters here com-

plained of and we are far from convinced that any miscarriage of justice has occurred.

The judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 6, 1934, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 22, 1934.