[Crim. No. 17805. First Dist., Div. Four. Feb. 22, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ALBERTUS CALDWELL et al., Defendants and
Appellants.

COUNSEL

Christopher Peterson and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, and Harriet Wiss Hirsch, Deputy State Public Defender, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CHRISTIAN, J.**—William Albertus Caldwell and Michael Lee Heide appeal from judgments of imprisonment which were rendered after a jury found them guilty of five counts of robbery (Pen. Code, § 211), one count of kidnaping for robbery (Pen. Code, § 209), one count of murder (Pen. Code, § 187) and three counts (two as to Heide and one as to Caldwell) of possession of a firearm by a felon (Pen. Code, § 12021).

On November 20, 1976, appellants entered the Apollo Food Market in Concord. Heide menaced a market employee with a loaded revolver and removed from a safe six or seven bags containing money. Heide then forced two other employees to empty two cash registers and hand over their contents. Appellants left the market together.

One week later, at approximately 8:30 p.m. on November 27, Heide and Caldwell, both armed, forced Harold Freeman into his parked automobile in Concord. Appellants entered the vehicle; Caldwell asked Freeman for his money and took $7. Heide drove the automobile some distance, with Caldwell giving directions. At a secluded spot appellants placed Freeman in the trunk of the automobile. They drove the car for

10 or 15 minutes more, and then stopped. Caldwell came to the trunk and told Freeman not to make any noise and that he would be standing nearby.

Julia Tarr was sitting in her automobile in front of the ABC liquor store in Concord on the evening of November 27. She could see inside the store, and saw that the clerk, Stuart Morris, looked "very glum." She also could see that another person was inside. She looked across the street, but her attention was drawn back to the store when she heard "two popping sounds." She saw Heide come through the door of the store, crouch down, fire a shot through the store window, take two or three more steps, stand up straight, and fire a second shot, which struck Morris. Heide turned, pointed his weapon at Mrs. Tarr for a few seconds, and then ran off. Morris died of a gunshot wound to his brain.

From inside the trunk of his stopped automobile Howard Freeman heard two gunshots. Within five minutes after the shots, he heard the driver's and passenger's doors close, and the car moved off. Freeman was kept in the moving automobile, either in the trunk or in the back seat, until approximately 10 the next morning. At one point Freeman was released from the trunk to stretch his legs, and saw Heide kick the ground and say, "The son of a bitch made me kill him," and "The mother fucker hadn't a done what he done I wouldn't a had to shoot the son of a bitch." Freeman escaped when the automobile ran out of gas and was abandoned by appellants in Santa Barbara County.

Appellants moved unsuccessfully for a change of venue, and the court denied two subsequent motions for reconsideration of the venue motion. ■ They contend that the court should have granted their motions on the basis that prejudicial pretrial publicity presented a reasonable likelihood that they could not have a fair trial. ■ A motion for change of venue must be granted when potentially prejudicial pretrial publicity has created a reasonable likelihood that a fair trial cannot be had in the absence of such relief. (*People* v. *Salas* (1972) 7 Cal.3d 812, 817 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383-384 [66 Cal.Rptr. 724, 438 P.2d 372].) ■ The reviewing court must independently evaluate the evidence to determine whether the defendant has obtained a fair and impartial trial. (*Id.; People* v. *Tidwell* (1970) 3 Cal.3d 62, 69 [89 Cal.Rptr. 44, 473 P.2d 748]; *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 13 [147 Cal.Rptr. 208].)

In determining whether a reasonable likelihood of unfairness existed as a result of pretrial publicity, courts have considered factors such as the size of the community in which the offense was committed, the relative brutality of the crime, the standings of the victim and of the accused in the community, the nature, frequency, and timing of the publicity, reports of confessions or other incriminating statements, and indications of continued community interest in the case. (*People* v. *Salas, supra*, 7 Cal.3d at p. 818; *People* v. *Tidwell, supra*, 3 Cal.3d at p. 70; *Maine* v. *Superior Court, supra*, 68 Cal.2d at pp. 385-386; *People* v. *Martinez, supra*, 82 Cal.App.3d at pp. 13-14; *Griffen* v. *Superior Court* (1972) 26 Cal.App.3d 672, 681 [103 Cal.Rptr. 379].) Where the appellate court evaluates the evidence on appeal from a judgment of conviction rather than on a petition for writ of mandate, an additional factor, the extent of the jurors' exposure to the pretrial publicity, must be considered. Lack of significant exposure to and recall of the publicity is a very strong indication that a defendant was not tried by a biased jury. (*People* v. *Salas, supra*, 7 Cal.3d at p. 818; *People* v. *Quinlan* (1970) 8 Cal.App.3d 1063, 1070 [88 Cal.Rptr. 125].)

Most of the factors indicating a reasonable likelihood of unfairness are absent in the present case. Contra Costa County is not small, the appellants and their victims were relatively anonymous, and the crimes committed were not unusually atrocious.

Appellants place primary emphasis on the nature and extent of the pretrial publicity as posing a reasonable likelihood of unfairness. During the week following the killing of Stuart Morris, in late November and early December of 1976, the two major San Francisco newspapers, four other newspapers serving Contra Costa County, and local television stations, all reported the participation of appellants and two female companions in a "crime spree" throughout California. The arrests of appellants were reported. Most of the remaining publicity occurred during the latter half of March 1977, when the media reported appellants' venue motion and Caldwell's conviction in San Luis Obispo on other charges. One newspaper, the Contra Costa Times, published an editorial entitled *"Justice" a Tool for Manipulators* denouncing the efforts of Heide's attorney to obtain a venue change. The newspaper published the results of its own survey in which 27 of 30 persons phoned at random said that they were not familiar with the names of Caldwell or Heide. Also in March, the news media reported that Caldwell had confessed on videotape to his participation in the so-called "crime spree" and that this confession was received in evidence in the San Luis

Obispo trial. The videotape was not received in evidence in the present case.

The pretrial publicity in the present case was substantial, and reports of confessions pose special dangers of prejudice. (See *People* v. *Salas, supra,* 7 Cal.3d at p. 818; *People* v. *Tidwell, supra,* 3 Cal.3d at p. 70; *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 386.) But the transcript of the voir dire examination of prospective jurors establishes that appellants were not tried by a biased jury. Of 160 prospective jurors, 41 remembered reading or hearing about the case. Only 2 of the 12 jurors ultimately selected had any recollections of reading or hearing about the case, and they could recall no details; the remaining 10 jurors had no recollections of exposure to the publicity. This absence of any significant juror recall of pretrial publicity is a very strong indication that appellants were not tried by a biased jury. (See *People* v. *Salas, supra,* 7 Cal.3d at pp. 818-819 [eight jurors did not recall reading or hearing about the case; recollections of remaining four were negligible].) Because the jurors were ignorant of pretrial publicity, it cannot be said that there was a reasonable likelihood that a fair trial could not be had in the absence of a change of venue. The trial court did not err when it denied appellants' venue motions.

■ Heide contends that the trial court erred when it limited the voir dire examination of prospective jurors by his counsel. In arguing one of the motions for reconsideration of the venue motion, counsel had contended that he could not intelligently select a jury unless he could ask whether the jurors had read about Caldwell's videotaped confession. The judge responded that jurors could be effectively selected by alternative means without exposing them in the courtroom to information about the confession. Nevertheless, in the voir dire examination of the first prospective juror, counsel asked, "Do you remember reading anything about a videotaped confession which Mr. Caldwell made?" The prosecutor objected, and the court sustained the objection. Caldwell's counsel moved for a mistrial and, in the alternative, that the jury panel be excused. The court denied these motions, admonished counsel not to ask any more questions regarding Caldwell's confession, and stated that if any juror indicated that he remembered reading about the case the juror could be examined in more detail outside the presence of the other jurors.

Citing *People* v. *Carmichael* (1926) 198 Cal. 534, 542-546 [246 P. 62], Heide contends that his counsel was improperly restricted to the

use of general questions that would not reveal juror awareness of Caldwell's confession. In *Carmichael*, it was held that defense counsel should have been permitted to question prospective jurors concerning their knowledge of a vote of ten to two for guilty in the defendant's previous trial, and that the error was not cured by questioning as to whether the prospective jurors had talked with jurors or witnesses in the former trial. Here, unlike in *Carmichael*, negative answers to the general questions regarding exposure to pretrial publicity logically imply negative answers to the specific question at issue here. If jurors stated that they had no recollection of pretrial publicity, this implied that they had no recollection of the details of that publicity, including the publicity given to Caldwell's confession. All of the selected jurors testified either that they had no recollection of the pretrial publicity or that they recalled no details of the publicity. To permit the detailed questioning would have presented the absurdity of exposing the prospective jurors to potentially prejudicial pretrial publicity in order to determine whether they had been exposed to such publicity. The trial court's handling of the situation was appropriate.

█ Caldwell complains of the trial court's refusal to dismiss the first jury panel, before which counsel for Heide asked the first prospective juror whether he remembered reading about Caldwell's confession. None of the members of the first jury panel was selected as a juror or alternate juror, but each was challenged for cause, and Caldwell exercised three peremptory challenges against members of the panel. After appellants had exhausted their peremptory challenges they both moved for additional peremptory challenges, and the court denied the motion; Caldwell thus is entitled to appellate review of his contention that the three denials of challenges for cause were erroneous and prejudiced him by compelling the exercise of peremptory challenges. (*Darcy* v. *Moore* (1942) 49 Cal.App.2d 694, 700-701 [122 P.2d 281]; see *People* v. *Eudy* (1938) 12 Cal.2d 41, 44-45 [82 P.2d 359].)

Each of the three jurors as to whom the challenges for cause were disallowed affirmed that he or she could be entirely impartial in spite of knowledge that Caldwell had allegedly confessed. When a juror consistently affirms a willingness and ability to act impartially in weighing the evidence and applying the law upon which he will be instructed, there must be facts which clearly show the juror's bias to warrant a reversal of the trial judge's decision not to excuse that juror for cause. (*People* v. *Earnest* (1975) 53 Cal.App.3d 734, 750 [126 Cal.Rptr. 107].) Caldwell does not point to, and the record does not establish,

facts which show that the three prospective jurors were biased as a result of the question posed by Heide's counsel. Two of the prospective jurors stated opinions that an alleged confession might be given under circumstances indicating it was not a true admission of guilt and the third stated that the evidence before her "would have to speak for itself." ■ Moreover, the question at issue was asked by counsel for Caldwell's codefendant, and "it should require a substantial showing of prejudice to permit verdicts in criminal cases to be overthrown by the actions of a co-defendant which are beyond the control of the prosecution and which might even be done deliberately for the purpose of upsetting any verdict." (*People* v. *Zingarelli* (1934) 137 Cal.App. 61, 65 [29 P.2d 905].) The requisite clear and substantial showing of prejudice is absent.

■ Heide complains of the trial court's denial of challenges for cause as to two other prospective jurors. One, McDonald, was peremptorily challenged jointly by the appellants; the other, Andrews, was selected as a juror. Like Caldwell, Heide requested and was denied additional peremptory challenges.

Heide argues that the voir dire examination of these two prospective jurors established that they were unable to follow the law with regard to reasonable doubt, burden of proof, and the defense of unconsciousness. As to these matters, the prospective jurors gave somewhat equivocal answers. Andrews initially stated that he felt that Caldwell had to "prove something," but the trial court subsequently explained the burden of proving guilt beyond a reasonable doubt and the right of a defendant not to testify. The prospective juror then stated that he would not vote for conviction if he had a reasonable doubt as to guilt and would not draw inferences from the defendant's failure to testify. McDonald initially expressed doubts as to whether he could follow the law regarding unconsciousness, and he stated that he didn't think he could vote for acquittal where a defendant killed under the influence of drugs. Under subsequent, more thorough questioning by the trial court, he stated that he would follow the instructions of the court regardless of his personal feelings.

■ Where a prospective juror gives conflicting answers to questions bearing on impartiality, the trial court's resolution of the conflict in determining the prospective juror's fitness is binding upon an appellate court. (*People* v. *Carter* (1961) 56 Cal.2d 549, 574 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *Earnest, supra*, 53 Cal.App.3d at p. 750.)

Only a clear showing of bias warrants a reversal on the basis of the trial court's decision to deny a challenge for cause. (See *People* v. *Earnest, supra*, 53 Cal.App.3d at p. 750.) Here nothing in the record clearly shows the prospective jurors to have been biased. Therefore, the court's determination that the prospective jurors could follow the court's instructions is not to be disturbed on appeal.

Heide contends that the court prejudicially erred in instructing the jury on his defense of unconsciousness. Heide's defense was primarily that he suffered from epileptic seizures causing unconsciousness when he committed the offenses with which he was charged.

Heide suffered a severe head injury in a motorcycle accident in 1969, causing brain damage. He began to suffer epileptic seizures, and in 1973 a physician diagnosed him as having posttraumatic epilepsy. His electroencephalogram was "mildly abnormal." The treating physician testified that as a result of the brain damage Heide suffered from grand mal seizures, which are manifested by a loss of consciousness and rapid clonic jerkings, and psychomotor seizures, which are manifested by a momentary loss of consciousness without convulsions. The brain damage also impaired Heide's ability to react appropriately to stress or frustration. Heide's heroin use exacerbated his condition; withdrawal phenomena from the cessation of heroin use may cause epileptic seizures.

The physician testified that fear or panic can trigger a continuous psychomotor seizure or a series of intermittent psychomotor seizures that can last over a period of hours or even days. A person suffering from a psychomotor seizure is capable of automatic movements, while in a state of unconsciousness, which might appear normal to an observer. The physician testified that during a psychomotor seizure a person, though unconscious, could possibly drive to a market, walk inside, give orders to people, brandish a gun, open the gun and display the bullets, take money out of a safe, and order people to empty money out of a cash register, while appearing in all respects to be normal.

A rebuttal witness testified that such activity would not be expected from a person suffering from a psychomotor seizure because it is too complicated and purposeful; the victim could not indulge in purposeful activity or react to outside stimuli. The witness described certain limited acts that victims have performed, for example, walking across a hospital ward and emptying drawers from a bedside table, snuffing a

cigarette out in one's hand, swinging an axe or one's fists, or placing an iron in a nearby kitchen sink in the midst of ironing. In this witness' opinion a psychomotor seizure cannot last for a period of days or weeks, but he admitted that some qualified experts disagree on this point. The witness further testified that epileptics do not have any memory of what takes place during a psychomotor seizure, and thus if a person committed a homicide during a seizure it would not be consistent for him to later state, as did Heide, that he had killed the victim.

Two witnesses testified that Heide was suffering from seizures prior to the commission of the charged offenses. Dan Boyce, a friend with whom Heide lived during November 1976, testified that Heide had a $200-$300 a day heroin habit, suffered numerous grand mal seizures, and would become quite excited and belligerent in reaction to stress. On November 22, 1976, Heide witnessed a stabbing by Boyce, who testified that when Heide saw the victim's wound he reacted by grabbing the victim and throwing him on the floor and then stated that he "was going to have to run." Heide's wife testified that she had seen her husband have numerous "rage reactions," and that prior to November 1, 1976, the last day she saw him before his arrest, she had seen him have seizures once or twice a week, including both grand mal seizures and "minor" seizures in which "he'd just drift off kind of half dazed. . .and he wouldn't have a grand mal seizure, not the jerking, but his eyes would roll back in his head."

Heide introduced testimony by his treating physician that if Heide were involved in a robbery and the victim drew a weapon, as Stuart Morris inferably did, resulting fear could induce a psychomotor seizure. On cross-examination the rebuttal expert concurred and also testified that a psychomotor seizure could be triggered as a result of the witnessing of a homicide. The treating physician testified that if Heide witnessed a killing he would be expected to react inappropriately, but would not necessarily suffer a seizure.

■ The trial court instructed the jury on the defense of unconsciousness by giving former CALJIC instructions Nos. 4.30 and 4.31. At that time, CALJIC No. 4.30[1] limited its application to persons of sound mind. The court in *People* v. *Kitt* (1978) 83 Cal.App.3d 834, 843-847 [148 Cal.Rptr. 447], subsequently held that Penal Code section 26

---

[1]Former CALJIC No. 4.30: "Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

should not be interpreted to preclude a defendant who is of unsound mind from relying on the defense of unconsciousness. Penal Code section 26 sets forth categories of persons who are not capable of committing crimes; the third category includes "Lunatics and insane persons," and the fifth category includes "Persons who committed the act charged without being conscious thereof." Older cases held that the unconsciousness category of Penal Code section 26 excludes persons of unsound mind, who are included in the insanity category. (*People* v. *Hardy* (1948) 33 Cal.2d 52, 66 [198 P.2d 865]; *People* v. *Methever* (1901) 132 Cal. 326, 329 [64 P. 481], disapproved on another point in *People* v. *Gorshen* (1959) 51 Cal.2d 716, 734 [336 P.2d 492].) *People* v. *Kitt* discerned a subsequent trend in the high court to view the terms "sound mind" and "legal sanity" as not being synonymous (see *People* v. *Baker* (1954) 42 Cal.2d 550, 568 [268 P.2d 705]), and concluded that, at present, Penal Code section 26 is properly interpreted as allowing a person of unsound mind to rely on the defense of unconsciousness. (83 Cal.App.3d at p. 845. See also *People* v. *Williams* (1971) 22 Cal. App.3d 34, 54-57 [99 Cal.Rptr. 103].) CALJIC No. 4.30 (1979 revision)[2] no longer limits the defense of unconsciousness to persons of sound mind.

■ While the giving of former CALJIC No. 4.30 was thus erroneous, Heide's contention that the error was prejudicial is without merit. This contention is based upon the premise that the jury might have found him to be lacking in soundness of mind, so that he could not invoke the defense of unconsciousness. But the jury was instructed on diminished capacity, and it nevertheless found appellants to be guilty of first degree murder (based upon a felony-murder instruction) and several first degree robberies. The finding that appellants were guilty of the

---

"This rule of law applies only to cases of the unconsciousness of persons of sound mind, such as somnambulists or persons suffering from the delirium of fever, psychomotor epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind."

[2]CALJIC No. 4.30 (1979 revision): "A person who commits an act while unconscious is not guilty of a crime.

"This rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from a delirium of fever, or because of an attack of [psychomotor] epilepsy, a blow on the head, the involuntary taking of drugs or the involuntary consumption of intoxicating liquor, or any similar cause.

"Unconsciousness does not require that a person be incapable of movement.

"Evidence has been received which may tend to show that the defendant was unconscious at the time and place of the commission of the alleged offense for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was conscious at the time the crime was committed, he must be found not guilty."

offenses in the first degree constituted a rejection of the evidence that Heide had *any* substantially reduced mental capacity, including unconsciousness, caused by mental illness or a mental defect such as epilepsy, at the time he perpetrated the robbery of the ABC Liquor Store (during which Stuart Morris was killed) and the robberies of Harold Freeman and the Apollo Food Market. (*People v. Kitt, supra*, 83 Cal. App.3d 834.)

Heide contends that the verdict of first degree felony murder did not necessarily resolve the question of unconsciousness because the jury might have concluded that the excitement of the ABC Liquor Store robbery and of Morris' picking up of a rifle triggered a psychomotor seizure *after* the formation of specific intent to rob, rendering Heide unconscious at the time he shot Morris. But even assuming the accuracy of this hypothesis, the error of excluding persons of unsound mind from the defense of unconsciousness was cured by the instruction itself, which included psychomotor epileptics as examples of persons of sound mind.[3] Moreover, the hypothesis is consistent with an accidental killing in the perpetration of a robbery, to which the felony-murder doctrine is applicable. (Pen. Code, § 189; *People v. Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793]; *People v. Satchell* (1971) 6 Cal.3d 28, 35 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People v. Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].)

 Heide also contends that it was error to give former CALJIC No. 4.31: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he was conscious, you should find that he was conscious.

"However, if, notwithstanding the defendant's appearance of consciousness, the evidence raises a reasonable doubt whether he was in fact conscious, you should find that he was then unconscious." The court in *People v. Cruz* (1978) 83 Cal.App.3d 308, 330-332 [147 Cal.Rptr. 740], held that this instruction failed to inform the jury that the prosecution is aided by a presumption that a defendant who acts as if he is conscious is presumed to be conscious but that this presumption is rebuttable and does not remove from the prosecution the burden of proving consciousness beyond a reasonable doubt. In *People v. Kitt, supra*, 83 Cal.App.3d at page 842, the court held, to the contrary, that the second paragraph of CALJIC No. 4.31 adequately explained the

---

[3]See footnote 1.

presumption. *Kitt* did hold, however, that former CALJIC No. 4.31 was erroneous in that it directed the jury that it "'should'" rather than "'must'" find a defendant to have been unconscious if the evidence raises a reasonable doubt. (*Id.*, at p. 843; italics deleted.) CALJIC No. 4.31 was revised in 1979 to accommodate the criticisms of both *Cruz* and *Kitt*.[4]

The court in *Kitt* convincingly suggests that the second paragraph of former CALJIC No. 4.31 tended to cure any error in the first paragraph; the criticism of former CALJIC No. 4.31 in *Kitt* remains valid. But any error was not prejudicial in the present case: The jury's verdicts of first degree murder and robbery rejected the evidence that Heide suffered from any diminished capacity, and necessarily included a rejection of Heide's unconsciousness defense independent of any misapplication of former CALJIC No. 4.31.

Heide contends that the trial court erred when it denied his motions for continuance of the trial and to reexamine prospective jurors. The court denied a motion for continuance after finding Heide competent to stand trial and appointing two doctors to examine him. Counsel subsequently moved for cessation of voir dire examination until the doctors' reports were received, arguing that he could not effectively select a jury without knowing what the doctors would report regarding Heide's sanity. The court denied the motion. After counsel received the reports, which suggested that Heide might have been suffering from psychomotor epilepsy at the time he committed the charged offenses, he requested that he be allowed to reexamine those jurors previously passed for cause regarding possible bias or prejudice on the issue of unconsciousness. The court also denied this motion.

█ The court did not err when it denied the motions for continuance prior to trial and during voir dire. "Continuances shall be granted only upon a showing of good cause." (Pen. Code, § 1050.) A request for a continuance is addressed to the sound discretion of the trial court, and the court's disposition of the motion will not be disturbed on appeal in

---

[4]CALJIC No. 4.31 (1979 revision): "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he were conscious, you should find that he was conscious, unless from all the evidence you have a reasonable doubt that he was in fact conscious at the time of the alleged offense.

"If the evidence raises a reasonable doubt that he was in fact conscious, you must find that he was then unconscious."

the absence of a clear abuse of that discretion. (*People* v. *Sandoval* (1977) 70 Cal.App.3d 73, 82 [138 Cal.Rptr. 609].) Heide did not show good cause for continuance. In his arguments on the motions prior to trial and during voir dire examination he did not suggest that the doctors' reports might provide information on a possible defense of unconsciousness. In making both motions counsel argued only that the reports might indicate a defense of diminished capacity, and that although the reports would be received prior to the beginning of the defense's case this information was essential to effective jury selection. Counsel obviously was aware of the possibility of a defense of diminished capacity and was able to question the jury in this regard. It was not an abuse of discretion to deny the motions.

At the trial stage here under discussion the court was presented with a number of motions in rapid succession, including a motion to discharge the jury panel or for mistrial, a motion for reexamination to determine whether previously passed jurors had heard anything in court that would have prejudiced them, the motion for reexamination with regard to unconsciousness, and a motion to discharge the jury panel on the basis that the county had systematically excluded blind persons from juries. ▮ The court erred when it denied Heide's motion to reexamine previously passed prospective jurors on the unconsciousness issue. Penal Code section 1078 confers upon a defendant a right to a reasonable examination of prospective jurors, and it is error for a trial court to refuse to allow a reasonable question to be put to a juror. (See *People* v. *Crowe* (1973) 8 Cal.3d 815, 823-824 [106 Cal.Rptr. 369, 506 P.2d 193].) The court may permit reexamination of a juror when pertinent information comes to the attention of counsel after acceptance of the jurors and before completion of the jury. (*People* v. *Durrant* (1897) 116 Cal. 179, 197 [48 P. 75].) Counsel argued that he had received one of the doctors' reports, which indicated that unconsciousness might be a defense, and that he thus should be allowed to reexamine prospective jurors regarding possible bias or prejudice concerning the defense. Such examination was reasonable, and should have been permitted, for it might have revealed grounds for a challenge for cause. Some of the subsequent prospective jurors who were examined on the defense of unconsciousness indicated inability to follow the law regarding the defense and were excused for cause.

The Attorney General suggests that the motion for reexamination was without merit because counsel for Heide must have known of the

potential unconsciousness defense prior to receipt of the court-appointed physicians' reports. As early as May 5, 1977, counsel had in his possession a letter from the physician who treated Heide for posttraumatic epilepsy in 1973, and this letter stated that Heide was suffering from grand mal convulsions and "small spells of peculiar feelings and a somewhat out of contact feeling with the environment." Although counsel might have picked up from this letter the possibility of an unconsciousness defense, the record does not reflect any medical opinion, prior to submission of the reports by the court-appointed physicians, that Heide might have been suffering from unconsciousness due to psychomotor epilepsy at the time he committed the charged offenses. We conclude that the request to reopen voir dire should have been granted.

 The error, however, was harmless. Heide's only claim of prejudice is that he used peremptory challenges against some prospective jurors without knowing whether there was a basis for a challenge for cause regarding the defense of unconsciousness. All of the jurors ultimately selected to try the case were questioned as to the unconsciousness defense (see *People* v. *Carmichael, supra,* 198 Cal. 534, 540), the court properly denied the challenge for cause to the one juror (Mr. Andrews) whom Heide claims he would have excused had he any remaining peremptory challenges, and the jury ultimately rejected the unconsciousness defense by virtue of its rejection of the claim of diminished capacity. It is not reasonably probable that a result more favorable to Heide would have been reached in the absence of the court's error in denying the motion for reexamination. (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)

 Caldwell contends that a warrant was required for his arrest. Prior to trial he unsuccessfully moved for suppression of evidence seized as a result of his warrantless arrest.

Caldwell was arrested at approximately 2 a.m. on December 1, 1976. A detective had gone to the home of Caldwell's mother-in-law on the evening of November 30; an acquaintance of Caldwell's, Eric Dushane, arrived, and at approximately 11 p.m. he told the detective that Caldwell had arrived at Dushane's home in a trailer park earlier that day. He said that Caldwell was armed, was "climbing the walls" because he needed drugs, was afraid that he would have to become involved in a shoot-out with the police, and had left at 4:30 that afternoon to get drugs and find another place to stay. At 11:42 p.m., Caldwell's wife was

seen at the trailer park, and the detective, Dushane, and other officers proceeded to the park. Caldwell was seen entering a trailer sometime between 12:30 and 1 a.m. During the interval between the time Caldwell was spotted and his arrest at approximately 2 a.m., the police placed several unanswered phone calls to the trailer, discussed potential methods of arresting Caldwell without losing sight of him, and spread officers out in the park trailer park to secure the area. Caldwell was arrested without further incident.

Caldwell contends that his warrantless arrest was not justified by exigent circumstances. ▆▆ An arrest warrant is required for a felony arrest in a house absent exigent circumstances calling for immediate action. The claim of exigent circumstances is to be measured by the facts known to the arresting officers. Such exigencies include an emergency requiring swift action to prevent imminent danger to life or serious damage to property or to forestall the imminent escape of a suspect or destruction of evidence. (*People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333], cert. den. 429 U.S 929 [50 L.Ed.2d 299, 97 S.Ct. 335].) The requisite exigency exists where robbers are armed when they leave the scene of a robbery and presumably still have those weapons at their residence (*James* v. *Superior Court* (1978) 87 Cal.App.3d 985, 994 [151 Cal.Rptr. 270]; see also *People* v. *Frierson* (1979) 25 Cal.3d 142, 169 [158 Cal.Rptr. 281, 599 P.2d 587]), or where the arresting officers were aware that a series of violent and vicious crimes was continuing unabated and required prompt action to prevent the commission of further offenses and the escape of suspects (*People* v. *Peterson* (1978) 85 Cal.App.3d 163, 170-171 [149 Cal.Rptr. 198]).

▆▆ Here the arresting officers were aware that Caldwell had participated in a recent series of violent crimes, that he was armed and feared a shoot-out, that he had been upset from a lack of drugs, and that he was planning to leave the trailer park and stay elsewhere. These facts established that swift action was required to prevent Caldwell's escape and imminent danger to the lives of others. Caldwell contends that an absence of imminent danger is established by the fact that the officers waited approximately an hour and a half after locating Caldwell before arresting him; but during this delay the officers attempted to phone Caldwell and discussed the danger involved in entering the trailer and the possibility of evacuating the trailer park. The mere fact that officers delayed a warrantless arrest in attempting alternate methods of

apprehending the suspect and deciding upon the steps they would take to achieve an arrest does not necessarily eliminate the justification for the warrantless arrest; to the contrary, in the present case it underscores the extent of the danger involved.

■ Caldwell contends that the court should have severed the Apollo Food Market charges (events of Nov. 20, 1976) from the ABC Liquor Store and Freeman charges (events of Nov. 27, 1976). This contention lacks merit. "An accusatory pleading may charge two or more different offenses connected together in their commission...or two or more different offenses of the same class of crimes or offenses, under separate counts..."; the court may in its discretion order severance in the interests of justice and for good cause shown. (Pen. Code, § 954.) The two sets of offenses in the present case, which included robberies, felony murder, and kidnaping for robbery, were of the same class of crime or offense in that they were committed for the purpose of or in the perpetration of robberies. (*People* v. *Conrad* (1973) 31 Cal.App.3d 308, 315 [107 Cal.Rptr. 421] [proper to consolidate information charging five counts of robbery with information charging one count of murder and one count of robbery, out of which the murder arose, because both informations charged the same class of crime or offense, robbery]; see also *People* v. *Moran* (1973) 33 Cal.App.3d 724, 726-728 [109 Cal.Rptr. 287].) The two sets of offenses were also connected together in their commission; their commission shared a common element of substantial importance, the intent to feloniously obtain property. (*People* v. *Conrad, supra*, 31 Cal.App.3d at p. 315.)

■ Caldwell contends that the prosecutor failed to present exculpatory evidence to the grand jury, so that the indictment should have been set aside or a postindictment probable cause hearing should have been held. At the grand jury proceeding a police sergeant testified that Caldwell said in his videotaped statement that Heide planned the ABC Liquor Store robbery and that Caldwell was to wait in the getaway car. Caldwell contends that the videotape actually contains a statement by Caldwell that he was completely ignorant of Heide's intentions in the liquor store robbery. But Caldwell has failed to show that the videotape contains any such statement by Caldwell. Caldwell did not provide the trial court or this court with anything more than three lengthy videotapes and his bare contention. After viewing the tapes the trial court stated that it could find no exculpatory evidence other than inconsistent statements by Caldwell. Caldwell has failed to sustain his burden of es-

tablishing that exculpatory evidence was not presented to the grand jury.

Caldwell contends that witnesses before the grand jury were asked questions defective in form and gave nonresponsive answers, and that the trial court erred when it denied his motion to dismiss the indictment upon these grounds. This contention is also without merit. **(19)** An indictment must be dismissed where the extent of incompetent and irrelevant evidence presented to the grand jury is so great that it is unreasonable to expect that the grand jury could limit its consideration to the admissible, relevant evidence. (*People* v. *Backus* (1979) 23 Cal.3d 360, 393 [152 Cal.Rptr. 710, 590 P.2d 837].) It is not reasonable to expect that the trivialities complained of by Caldwell so affected the grand jury.

Heide received credit against his prison sentence for 372 days he actually spent in presentence custody. He contends that under Penal Code section 4019 he is entitled to additional credit for 186 days of good time/work time while in custody before his sentences commenced. Caldwell, who received credit for 356 days actually spent in presentence custody, makes no similar contention, but his entitlement to relief is plain, and we shall deal with the problem in our disposition of the appeal.

Similar issues are pending before the Supreme Court in several cases. Because the Supreme Court will decide the question, this court summarily holds that on its face Penal Code section 4019 does not apply to presentence custody of persons convicted of a felony and sentenced to state prison; however, constitutional equal protection of the laws principles require that appellants be given credit for good time/work time, if any, attributable to the time they served in presentence custody.

Heide contends that the trial court erred in imposing consecutive sentences in addition to his term of life imprisonment for murder. Again, Caldwell makes no similar contention, but his entitlement to relief is equal. At the time appellants were sentenced, Penal Code section 669 provided that terms of imprisonment shall merge and run concurrently with an expressly prescribed term of life imprisonment. Appellants were sentenced to state prison for the term prescribed by law for first degree murder, which carried an express penalty of life im-

prisonment. (Pen. Code, § 190.) All other terms of their imprisonment thus merged into the life terms. (*People* v. *Sewell* (1978) 20 Cal.3d 639, 642 [143 Cal.Rptr. 879, 574 P.2d 1231]; see also *In re Ward* (1966) 64 Cal.2d 672, 678 [51 Cal.Rptr. 272, 414 P.2d 400], cert. den. 385 U.S. 923 [17 L.Ed.2d 147, 87 S.Ct. 238]; *People* v. *Salas* (1978) 77 Cal.App.3d 600, 608 [143 Cal.Rptr. 755].)

Heide's additional term of imprisonment for firearm use during the commission of a felony (Pen. Code, § 12022.5) cannot be consecutive to his life term. (*People* v. *Walker* (1976) 18 Cal.3d 232, 243-244 [133 Cal.Rptr. 520, 555 P.2d 306].)

The judgment is modified by merging into appellants' terms of life imprisonment their other terms of imprisonment and striking Heide's firearm use findings. As modified the judgments are affirmed and the causes remanded to the superior court for determination of the amount of good time/work time credit to which appellants may be entitled, if any, attributable to the time they served in presentence custody. The superior court will modify the abstracts of judgments accordingly and transmit them to all appropriate authorities.

Rattigan, Acting P. J., and Poché, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied April 24, 1980. Bird, C. J., was of the opinion that the petitions should be granted.