[Crim. No. 3065. Fifth Dist. Mar. 12, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS EUGENE PHILLIPS, Defendant and Appellant.

358

**COUNSEL**

Quin Denvir and Paul Halvonik, State Public Defenders, under appointment by the Court of Appeal, Gary S. Goodpaster, Chief Assistant State Public Defender, and Ted W. Isles, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just and Nancy L. Sweet, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CREEDE, J.**\*—Appellant was convicted after a bifurcated jury trial of murder in the second degree (Pen. Code, §§ 187, 189) with the finding that he used a firearm under Penal Code section 12022.5. The same jury found he was sane at the time the offense was committed. The court denied probation, struck the jury's finding on the use of a firearm, and sentenced appellant to state prison for the term prescribed by law.

Phillips asserts three grounds for reversal: (1) denial of due process in the guilt phase when the court informed the prospective jurors in voir dire that appellant also had pleaded not guilty by reason of insanity; (2) the jury should not have been instructed that defendant had the burden of proof on the sanity issue; and (3) the court erroneously instructed on the M'Naghten rather than the American Law Institute (ALI) test as a standard of mental incapacity in the sanity phase of the trial.

### Statement of the Facts

The basic facts concerning the homicide were not in dispute except for the identity of appellant as the assailant. In the late evening of July 9, 1976, the victim, Cardell Edwards, and appellant had an altercation outside the Elks Lodge in Bakersfield, California. At 1 a.m. on July 10, 1976, a person identified by several witnesses as appellant emerged from the men's room inside the Elks Club and killed Cardell Edwards with one blast from a sawed-off shotgun as the victim sat at a table near the dance band. Witness John Nathaniel Armstiead made both a lineup and in-court identification of appellant as the one who shot the deceased and left the premises. Although the lights were dim and there was considerable commotion after the shooting, Armstiead said he saw clearly that appellant was the assailant. His testimony was fortified by the fact he knew appellant previously and worked near his place of employment.

After the shooting, Gwendolyn Charles observed appellant walk directly in front of her toward the entrance with the gun open at the breech. She saw him close the gun as he walked. The witness could not identify appellant in a lineup and her in-court identification was based primarily on hairstyle. Although other patrons and members of the band were close to the shooting, they could not identify the perpetrator in the diminished light and resulting melee. There were discrepancies in the testimony of the witnesses with regard to the type and color of clothing

---

\*Assigned by the Chairperson of the Judicial Council.

and hair length of appellant in contrast to the man with the gun. Appellant was observed entering the Elks Club shortly before the shotgun blast.

Appellant was examined on July 12, 1976, by Dr. Mary Josephine Siemon, a physician from Kern Medical Center assigned to the jail. Dr. Siemon made the possible diagnosis of psychotic reaction from the use of phencyclidine.[1] The jail record indicated appellant had been in a daze since his arrest. He complained of someone being after him which, if true, would be a delusional manifestation of paranoia. Other witnesses described appellant as appearing quite normal in the evening hours preceding the homicide without any aberrant behavior. Steven Lerner, a clinical psychologist with extensive experience in the effects of drug use, testified PCP remains in the body tissues for a significant period of time. Users can suffer amnesia, lose touch with their immediate environment, have symptoms of schizophrenia, or experience a fluctuating state of consciousness. The mental capacity of a PCP user is decreased, although he may appear to have normal speech and gait. Much aggressive behavior occurs under the influence of PCP.

Dr. J. Wesley Sanderson, a clinical psychologist called by appellant, administered the Wechsler Adult Intelligence Scale (WAIS), the wide-range achievement test, a Bender visual motor Gestalt test, the Goodenough Harrison drawing test in addition to the Minnesota Multiphasic Personality Inventory. The WAIS scale showed an average verbal score but performance I.Q. was at the level of borderline mental deficiency. Full scale I.Q. was in the normal adult range. He was below average on subtests requiring immediate alertness, visual-spacial-sequential and perceptual-analytic abilities. The Halstead-Reitan neuropsychological test battery demonstrated mild to moderate brain impairment. The test results were highly variable with normal performance on some and poor on others. An electroencephalogram was mildly abnormal. Dr. Sanderson concluded he had a developmental deficiency in the brain hemispheres greater on the right than left. On an impairment scale of 0 to 1.0 (very severe), appellant's score was .07 in the mild to moderate impairment range. He was viewed as a person with a paranoid-schizophrenic thought process, and the test results indicated he was very disturbed. Other psychiatrists appointed by the court, upon whose reports Dr. Sanderson relied, found appellant to have a significant personality disorder, with a possible diagnosis of schizophrenia, latent type. Appellant gave Dr.

---

[1]Commonly known as PCP or "Angel Dust."

Sanderson a history of moderately heavy drug use for an extended period of time.

Dr. Francis Matychowiak, a psychiatrist appointed by the court and called by respondent, testified appellant had a personality disorder, namely an immature personality associated with a substance abuse history, primarily of hallucinogens. In his opinion there was no evidence of psychotic or diffuse neurotic disorders. Appellant had a recollection of a fight in which his shirt was torn, bruises were sustained and went home to change clothes. He returned to the Elks Club, remembers a commotion and an outburst before he left again. He consumed alcohol and other substances before and after the fight. It was Dr. Matychowiak's opinion he had the mental capacity to form the intent to kill on July 10, 1976.

In the sanity trial, Dr. Matychowiak testified the personality disorder and history of the use of hallucinogens was not of sufficient severity to prevent him from knowing the seriousness of the act or that it was wrong. He had sufficient mental capacity to be aware of the duty imposed by law. Appellant testified on the issue of sanity that he used heroin by inhalation for two years starting at age 19 and often used "speedballs," a mixture of heroin and cocaine. At various times he ingested LSD and PCP which caused hallucinations often lasting up to 12 hours. Appellant testified in 1976 he used up to $600 a week of cocaine.

Before the wrestling episode with the victim, appellant inhaled a "speedball" (heroin and cocaine) and smoked about one tablespoon of PCP rolled into eight to ten marijuana cigarettes. He remembered wrestling with Cardell Edwards in a "playful" manner and returning home to change clothes. He went to a liquor store with his sister and recalled being at the Elks Club. There was a loud noise, screaming and commotion. He denied having a shotgun or that he held any animosity toward the deceased. The history given Dr. Samler, another court-appointed psychiatrist, was inconsistent with appellant's claimed inability to recall the details of the evening. No psychiatric or psychological evidence was produced on the sanity issue other than the testimony of Dr. Matychowiak. The jury was instructed the evidence in the guilt phase could be considered in the sanity trial and on the time honored M'Naghten definition of insanity.[2]

---

[2]CALJIC Nos. 4.00, 4.01, 4.02.

■ ADVICE DURING JURY SELECTION OF DUAL PLEAS WAS NOT A DENIAL OF DUE PROCESS CONTRARY TO PENAL CODE SECTION 1026.

At the outset of the trial, and on two subsequent occasions when additional jurors were summoned, the court read the information and informed the prospective jurors appellant entered pleas of not guilty and not guilty by reason of insanity. Penal Code section 1026 provides: "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, *he shall first be tried as if he had entered such other plea or pleas only,* and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. . . ." (Italics added.) Appellant contends the court's conduct was contrary to Penal Code section 1026 and denied him due process by inviting the jury directly or by implication to believe his not guilty plea was not to be taken seriously. It is argued the court's action on three occasions inevitably influenced the jury's assessment of defendant's defense of drug-induced diminished capacity, and more significantly, caused the jury to discount defendant's attack upon the accuracy of the identification testimony.

The sanity issue must be tried ". . . either before the same jury or before a new jury in the discretion of the court. . . ." (Pen. Code, § 1026.) If before the same jury, it is the duty of the court to fully instruct the jury on their duties in the separate phases of the trial. Bifurcated trials before the same jury on the issue of sanity were held to provide due process and comply with constitutional requirements in *People* v. *Wein* (1958) 50 Cal.2d 383, 408 [326 P.2d 457].[3] In *Wein,* defendant claimed the right to have a separate panel try the insanity issue and urged that he would be prejudiced by voir dire examination on the dual alternative pleas. Our Supreme Court held there was no denial of due process or of a fair trial because a defendant is required in the discretion of the court to submit the issue of insanity to the same jury which passed on the question of guilt as prescribed in Penal Code sections 1016 and 1026 stating: ". . . it has long been held that the proper time for the examination of the prospective jurors on the issue of insanity is during their selection at the beginning of the trial." (*People* v. *Wein, supra,* 50 Cal.2d at p. 408; see also *People* v. *Woods* (1937) 19 Cal.App.2d 556, 558 [65 P.2d 940]; *People* v. *Foster* (1934) 3 Cal.App.2d 35, 39 [39 P.2d 271]; *People* v. *Davis* (1928) 94 Cal.App. 192, 197 [270 P. 715].) Since prospective jurors may be examined by either party on their state of mind toward the issue of

[3] Overruled on other grounds in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1140 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].

insanity at the beginning of the trial, it is not error for the trial judge to advise the jurors of the divided nature of the issues and the duality of the pleas separating the trial into several phases. "The trial was one continuous proceeding and it would be highly impractical to examine the jurors as to their qualifications during the stages of its progress." (*People* v. *Davis, supra,* at p. 197.)

If desired either party has the opportunity to examine prospective jurors on their state of mind toward the rule of diminished capacity and insanity at the beginning of the trial. "We are not to assume that such a jury will cease to be fair and impartial as the cause progresses upon its successive issues, but, on the contrary, we must assume, in the absence of any other showing, that the jury has retained its attitude of fairness and impartiality under the changed procedure as before until the whole cause, submitted to it successively for its consideration, has been determined. . . ." (*People* v. *Leong Fook* (1928) 206 Cal. 64, 78 [273 P. 779]; see also *People* v. *Wein, supra,* 50 Cal.2d at p. 408.)

At trial appellant challenged the adequacy of the identification and in the alternative sought to reduce the specific intent crime of murder to a lesser included general intent crime of involuntary manslaughter. Appellant argued that years of drug usage together with those consumed on the day before the murder created an incapacity to form the requisite mental status for murder. His trial counsel characterized him as having a mental defect resulting in paranoid and schizophrenic thinking processes accompanied by flashbacks and amnesia. Nothing in the trial record supports appellant's contention that advice of the insanity plea influenced the jury's assessment of appellant's defense of diminished capacity from drug usage. The finding of murder in the second degree was a recognition of lack of capacity to premeditate and deliberate. The fact the jury did not go further and reduce the offense to involuntary manslaughter does not mean appellant did not receive fair and impartial consideration on diminished capacity. To the contrary, advice of the insanity plea prepared the jury for the forthcoming evidence of mental defect and incapacity which was offered in the guilt phase of the trial and provided the parties with an opportunity to examine the jurors, if they chose to do so, on their attitude toward evidence bearing on appellant's mental state. There is nothing before us to suggest the jury did not fully and fairly consider the vigorously contested issue of identity on its merits uninfluenced by the evidence concerning appellant's mental status.

In view of appellant's failure to raise the issue at trial of alleged impropriety in placing the two pleas before the jury for appropriate voir dire, it is not now recognizable on appeal. If such advice was inconsistent with the strategy or tactics of trial counsel, or potentially could have an adverse effect on his position, the following procedures were available to raise the issue but not utilized: (1) move the court to exercise its discretion under Penal Code section 1026 to have a different jury try the issue of sanity; (2) motion *in limine* at the beginning to place reasonable restrictions on voir dire to limit excessive intrusion of the sanity issue into the guilt phase; (3) objection to the advice of the dual pleas and motion for a new jury panel; (4) motion for mistrial. It is significant to note three jury panels were called without any such motion, objection, request for mistrial, or for another jury panel since jeopardy had not yet attached. Appellant's assertion he was denied due process by the trial court's handling of this routine matter of trial procedure is unsupported. Similarly, appellant argues without foundation in the record that the advice of dual pleas in some unexplained manner caused the jury to discount his attack on the identification testimony. Appellant independently of the issue of diminished capacity fully challenged the accuracy of the identification and called witnesses close to the incident who were unable to identify the assailant because of diminished lighting and confusion during the melee after the shooting. Appellant has not demonstrated any inability of the jury to separate and consider fairly and impaïially these separate and distinct issues.

Lastly, even assuming the trial court should not have mentioned the insanity plea prior to the commencement of the trial on that issue, such error is harmless within the meaning of *Chapman* v. *California* (1966) 386 U.S. 18, 23-26 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065] and *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

### THE APPELLANT RETAINS THE BURDEN OF PROOF ON THE ISSUE OF INSANITY

Appellant's second contention relating to instructions on the burden of proving insanity was advanced while the issue was again before the California Supreme Court for ultimate resolution in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]. In *Drew,* the court rejected a contention that requiring a defendant to bear the burden of proving insanity violates the due process clause of the California Constitution (Cal. Const., art. I, § 7) as we reject appellant's identical argument here. The Supreme Court pointed out: "California courts,

however, have consistently upheld the constitutionality of our rule placing the burden of proof on the defendant," citing *People* v. *Hickman* (1928) 204 Cal. 470, 477-478 [268 P. 909, 270 P. 1117]; *People* v. *Miller* (1972) 7 Cal.3d 562, 574 [102 Cal.Rptr. 841, 498 P.2d 1089]. *Drew* lays to rest appellant's due process challenge to the burden of proof on the sanity issue.

## THE DREW ISSUE

In *Drew,* the Supreme Court adopted the ALI test for insanity. Under that test, "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." (Model Pen. Code (Proposed Official Draft 1962) § 4.01, subd. (1); *People* v. *Drew, supra,* 22 Cal.3d at p. 345.) Thus, there are two prongs to the test for insanity: (1) cognitive and (2) volitional. In the sanity trial, Dr. Matychowiak testified the use of drugs on the night in question did not render appellant incapable of knowing his act was wrong, but added that he would be more likely to react rather than to stop and think. The testimony of respondent's expert witness in the sanity trial, as well as the other evidence, gives rise to a challenge based on the "volitional" prong of the ALI test, not encompassed within the "cognitive" focus of the M'Naghten definition of insanity.

### ■ SHOULD APPELLANT'S CONVICTION BE REVERSED BECAUSE HIS MENTAL CAPACITY WAS EVALUATED BY A JURY INSTRUCTED ON THE M'NAGHTEN TEST FOR INSANITY?

*Drew* specifically applies retroactively to "cases not yet final in which the defendant has pled not guilty by reason of insanity . . . ." (*People* v. *Drew, supra,* 22 Cal.3d at p. 348.) Consequently, *Drew* is applicable to this case.

Obviously, in view of the fact that the ALI test was adopted subsequent to the jury trial in this case, neither witnesses nor counsel structured their presentation at the trial (nor was the jury instructed) in terms of the ALI rule. As we understand the teachings of *Drew,* the failure to apply the ALI test is not reversible per se. Under the circumstances the function of this court is to examine the record and determine whether the error was prejudicial under California Constitution, article VI, section 13 (see *In re Ramon M.* (1978) 22 Cal.3d 419, 431 [149 Cal.Rptr. 387, 584 P.2d 524]),

i.e., whether it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the error. (See also *People* v. *Sargent* (1978) 86 Cal.App.3d 148, 153 [150 Cal.Rptr. 113].) While it may be extremely difficult to apply such a rule to a case in which everyone involved used an incorrect standard and not conclude that a new trial is required, nevertheless, a determination must be made as to whether it is reasonably probable a different result would have been reached under the ALI test. If our Supreme Court was requiring that all cases of insanity on appeal at the time of *Drew* be reversed, their use of the reasonable probability language would have been unnecessary.

This court has examined the record to determine if there is a reasonable probability that a properly instructed jury, with court and counsel being guided by the ALI criteria, would have found appellant not guilty by reason of insanity. On the issue of sanity, CALJIC No. 4.05 "Insanity—'Irresistible Impulse'" was offered and refused for the reason the trial court considered "uncontrollable or irresistible impulses" are not issues in this case, noting there was "no evidence or inference of same." The pre-*Drew* "Irresistible Impulse" instruction does not conform to the ALI test of insanity.

In view of the evidence of appellant's mental capacity having some of the manifestations of schizophrenia and paranoia, his mild to moderate developmental brain impairments, the possibility he experienced a fluctuating state of consciousness and loss of contact with his surroundings as a sequelae of the ingestion of drugs that day, we conclude that if the case had been tried under the ALI standard and the jury instructed accordingly, there is a reasonable probability the jury would have reached a contrary result as to sanity. Moreover, the issue of volition, as distinguished from awareness of wrongfulness, was not directly addressed in the sanity trial.

It is recognized that appellant's claimed lack of recollection was seriously disputed. Several witnesses testified he appeared normal to all outward appearances. The jury rejected appellant's contention that diminished capacity impaired his ability to form the essential specific intent to kill. While the jury decided appellant had the cognitive ability to know the nature and quality of the act and that it was wrong, we are left to speculate as to what might be the finding if the evidence were presented and the jury instructed under the more expansive volitional concept of the ALI test. There is substantial evidence that appellant lacked volitional capacity under the ALI definition of sanity.

In summary, the issue of volition and ability of appellant to conform his conduct to the requirements of the law under the ALI rule, as distinguished from knowledge of the nature and wrongfulness of appellant's conduct, was not considered in witness interrogation or instructions because of the understandable reliance of court and counsel on the then applicable M'Naghten rule. There is substantial evidence that appellant lacked capacity to conform his conduct to legal requirements. We conclude it is reasonably probable that if the ALI test were employed that appellant would have been declared insane, and therefore the failure to so instruct was prejudicial. (Cal. Const., art. VI, § 13.)

The judgment is reversed and the cause remanded for a new trial on the issue raised by appellant's plea of not guilty by reason of insanity. That portion of the judgment finding the appellant guilty of murder in the second degree, apart from the issue of insanity, is affirmed.

Brown (G. A.), P. J., and Hopper, J., concurred.