[No. AO11618. First Dist., Div. Four. Nov. 14, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
LEANDRO BOYES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Certified for partial publication except as to parts A, C, and D pursuant to rule 976.1 of the California Rules of Court.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Jean Sternberg, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Martin S. Kaye, and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BALLACHEY, J.*—Leandro Boyes appeals from his conviction of murder (Pen. Code, § 187),[1] attempted murder (§§ 664/187), and attempted rob-

---

*Assigned by the Chairperson of the Judicial Council.

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

bery (§§ 664/211). The jury also found firearm use allegations to be true with respect to all three counts. The verdicts were returned on August 12, 1981.

On September 30, 1981, the trial court denied appellant's motion for a new trial. It sentenced appellant to 17 years to life imprisonment for second degree murder as enhanced by the firearm use finding. It imposed an additional consecutive term of three years representing one-third of the midterm for attempted murder as enhanced by the use allegation. Finally, it imposed a stayed sentence of eight months for attempted robbery.

Later, on October 20, 1981, the trial court vacated the sentence imposed on September 30. It ordered appellant to serve the full midterm of 7 years for attempted murder consecutive to the 17-years-to-life sentence on the murder count with the use enhancement. It again stayed the attempted robbery sentence. The total sentence was thus 24 years to life, rather than 20 years to life as originally ordered.

On New Year's Eve 1980, the decedent, Tony Zapeda, and Paul Perez went to the St. Francis Hotel in San Francisco where they had several drinks. At 2 a.m., they drove to Cesar's Palace on Mission Street; they parked up the street from the club. When they emerged from Caesar's at about 4:30 a.m., they were unable to start the car. Zapeda removed his jumper cables from the car and opened the hood while Perez began walking back to Cesar's to seek assistance from Zapeda's cousin whom they had seen there. Before Perez reached the club, a black Lincoln drove by. Zapeda, standing in the street by his disabled car, said something like "All I need is a jump." An occupant of the car shouted "Get out of the street, punk." Perez heard three or four shots and saw Zapeda fall backwards. The Lincoln sped away.

Benny Andino, another patron of Cesar's, observed the occupants of the Lincoln shortly before the shooting. Andino identified the driver of the vehicle as codefendant Eduardo Henriquez (who was acquitted on motion with respect to the murder and by the jury on the remaining charges) and the front seat passenger as appellant Leandro Boyes. After the Lincoln pulled away from the front of Cesar's, Andino saw it stop for a moment up the street. He heard three shots and saw the car "peel" away and turn right at the corner of Valencia and Mission.

Austin Fretty encountered the Lincoln and its occupants not long after the Zapeda shooting. At 5 a.m., Fretty was walking along Dolores Street on his way home from a New Year's Eve party. At the corner of 20th and Dolores a man Fretty identified as appellant accosted him at gunpoint and

demanded money. Before Fretty could comply appellant fired, telling him "I'm going to kill you, punk." Appellant fired another five rounds at Fretty, emptying the pistol. He walked away without picking up the money Fretty had thrown to the ground. Appellant walked to a large black car parked "catty corner" across the street. Fretty saw two other men and two women in the car. The victim was hospitalized and ultimately survived his wounds.

At 5:30 a.m., police officers investigating the Zapeda shooting saw the Lincoln parked at a Shell service station and detained its occupants. They were identified as Henriquez, the driver, Antoinette Imholz, the middle frontseat passenger, appellant Leandro Boyes, the right frontseat passenger, and Ricky Rodriguez and Karen Denton, the backseat passengers.

A .38 caliber handgun was found in the waistband of Imholz' pants. Police also found a box of .38 caliber ammunition on the floor of the car and two .38 caliber shell casings in appellant's shirt pocket. Ballistics tests confirmed that the gun seized from Imholz had been used in the shootings of Zapeda and Fretty. Appellant told the police he could "barely remember" firing the gun. The officers stated that appellant appeared sober at the time of his arrest.

The two female passengers testified for the prosecution. Denton received immunity from prosecution while Imholz was permitted to plead guilty as an accessory to the charged crimes.

The women testified that they had been walking home from Cesar's about 4:45 a.m. when Henriquez pulled up in the Lincoln and offered them a ride home. Imholz and Denton accepted. Henriquez, appellant and Rodriguez all had beers in their hands and appeared to have been drinking earlier in the evening. Appellant in particular was acting oddly. Imholz stated he seemed "really high" and was "just staring." As they were driving away from Cesar's, a man approached the car. Appellant shouted loudly at the man to get out of the street. Denton and Imholz then heard three shots fired from the front seat. They testified, however, that they did not actually see the gun in appellant's hand. Similarly, Henriquez testifying in his own defense, claimed to have heard three "pops" from the front passenger seat but not to have seen appellant fire.

Henriquez drove the Lincoln away from the scene. Appellant sat impassively, displaying no emotion. Later, however, appellant suddenly became angry with Rodriguez for flirting with Denton and told him to "knock it off."

As they were driving down Dolores Street, appellant suddenly told Henriquez to stop the car. Appellant said, "Wait a minute," and ran across the

street. The other occupants of the car saw appellant speak to a man on the corner. They heard more "pops" and the man screamed, "No!" Appellant returned to the car and they departed. Again, he displayed no emotion.

Although the other occupants were only vaguely aware appellant had shot anybody on either occasion, his behavior had by this time frightened them. Henriquez whispered to Imholz to hide the gun. She placed it under her sweater. Shortly later, police officers arrested the group at the Shell station.

A toxicologist testified for the defense that tests of blood and urine samples taken from defendant about 11 a.m. indicated that at 5 a.m. his blood alcohol level was approximately .15. The tests also revealed the presence of cocaine and PCP. His blood contained .03 micrograms per milliliter of PCP and his urine .07 micrograms per milliliter. The toxicologist testified that even a fairly low quantity of PCP can significantly alter behavior. Reactions to PCP vary among individuals. "Some just don't do anything, just staring, and other people behave violently or other ones just don't even hear anybody talking to them."

Dr. David Smith, director of a drug abuse clinic, testified that the use of alcohol with PCP increases the probability of a violent reaction. On the basis of his interview with appellant in jail, Dr. Smith stated that appellant had a history of alcohol and PCP abuse, but had not used PCP for about four months prior to the New Year's Eve incidents. Appellant told Smith that he had consumed alcohol and cocaine that night and later smoked what he believed was simply a marijuana joint. The joint induced feelings of PCP intoxication, frightening appellant. Appellant told Smith he was only vaguely aware of what transpired during the rest of the night. "His sense became progressively more irritated and then after that has very vague and distorted recall of what transpired, had flashes of memory, distortions, disassociation, hearing a gun firing but not knowing what happened."

On the basis of this interview and the results of the tests on appellant's blood and urine, Smith concluded that appellant had been unable to harbor malice aforethought or the specific intent to rob or kill anyone at the time of the incidents. He admitted, however, that the levels of alcohol and PCP in appellant's system would not inevitably prevent someone from harboring such intent.

A. . . . . . . . . . . . . . . . . . . . . . .*

B. ▮▮▮ Did the instruction on the rebuttable presumption of consciousness impermissibly lighten the prosecution's burden of proof?

---

*See footnote, *ante,* page 812.

The court defined unconsciousness and delivered the following instruction concerning its proof: "Evidence has been received which may tend to show that Defendant Boyes was unconscious at the time and place of the commission of the alleged offense for which he is here on trial. If after a consideration of all the evidence you have a reasonable doubt that the Defendant was conscious at the time the crime was committed he must be found not guilty.

"If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the Defendant Boyes acted as if he was conscious, there is a rebuttable presumption that he was conscious, as to which rebuttable presumption the Defendant has the burden of raising a reasonable doubt.

"However, if, notwithstanding the Defendant's appearance of consciousness, the evidence raises a reasonable doubt whether he was in fact conscious, you must find that he was then unconscious."

Appellant contends the rebuttable presumption of consciousness contravenes *Ulster County Court* v. *Allen* (1979) 442 U.S. 140 [60 L.Ed.2d 777, 99 S.Ct. 2213], and *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450], by reducing the prosecution's burden of proving guilt beyond a reasonable doubt. ■ Defense counsel's apparent failure to object to this instruction does not waive any error in its delivery. (*People* v. *Roder* (1983) 33 Cal.3d 491, 497, fn. 6 [189 Cal.Rptr. 501, 658 P.2d 1302].)

The instruction here accurately defined the judicially created presumption of consciousness recognized under California law. (See generally *People* v. *Hardy* (1948) 33 Cal.2d 52, 63-66 [198 P.2d 865]; *People* v. *Caldwell* (1980) 102 Cal.App.3d 461, 478-479 [162 Cal.Rptr. 397]; *People* v. *Kitt* (1978) 83 Cal.App.3d 834, 842-843 [148 Cal.Rptr. 447].) Further, respondent concedes the effect of the instruction was that upon a showing beyond a reasonable doubt of an appearance of consciousness the burden of persuasion, not merely the burden of going forward with the evidence, would shift to defendant. ■ Therefore, the narrow question before this court is whether the issue of consciousness is subject to the constitutional proscription against presumptions which lighten the prosecution's burden of proving the elements of an offense beyond a reasonable doubt.

In every decision cited by appellant the presumption held invalid clearly involved proof of an element of the charged offense. (*Sandstrom* v. *Montana, supra,* 442 U.S. 510 [intent to cause "ordinary consequences" of one's acts]; *Ulster County Court* v. *Allen, supra,* 442 U.S. 140 [possession

of hand gun by the defendant]; *People* v. *Roder, supra,* 33 Cal.3d 491 [knowledge of stolen character of goods]; *People* v. *Henderson* (1980) 109 Cal.App.3d 59 [167 Cal.Rptr. 47] [possessor's alteration of manufacturer's number on handgun]; *People* v. *Burres* (1980) 101 Cal.App.3d 341 [161 Cal.Rptr. 593] [intent to commit a battery].) In urging us to disregard the distinction between elements of an offense and affirmative defenses, appellant ignores the unambiguous holdings of the Supreme Court on this subject: "We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. . . . We therefore will not disturb the balance struck in previous cases holding that the due process clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here." (*Patterson* v. *New York* (1977) 432 U.S. 197, 210 [53 L.Ed.2d 281, 292].) Accordingly, *Patterson,* distinguishing *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881], found no infirmity in a requirement a defendant prove he acted under "extreme emotional disturbance" as the statute defining the charged offense did not include the absence of such a condition as an element of the crime.

*Engle* v. *Isaac* (1982) 456 U.S. 107 [71 L.Ed.2d 783, 102 S.Ct. 1558], the most recent Supreme Court authority on this subject, echoes *Patterson*'s emphasis upon close scrutiny of the statutory definition of the offense and its defenses: "Our opinions suggest that the prosecution's constitutional duty to negate affirmative defenses may depend, at least in part, on the manner in which the State defines the charged crime. [Citations.] These decisions, however, do not suggest that whenever a state requires the prosecution to prove a particular circumstance beyond a reasonable doubt, it has invariably defined that circumstance as an element of the crime. A state may want to assume the burden of disproving an affirmative defense without also designating absence of the defense an element of the crime. [Fn. omitted.] The due process clause does not mandate that when a state treats absence of an affirmative defense as an 'element' of the crime for one purpose, it must do so for all purposes." (*Id.,* at p. 120 [71 L.Ed.2d at pp. 795-796].)

A comparison of federal decisions concerning various states' presumptions and burdens of proof regarding self-defense illustrates the subtlety of the distinction between elements and affirmative defenses drawn in *Patterson* and *Engle.* A number of decisions hold that where a state characterizes a killing in self-defense as lawful and defines murder or manslaughter as an

"unlawful" killing, absence of self-defense is actually an element of the crime as to which the burden of proof must remain with the prosecution. (*Tennon* v. *Ricketts* (5th Cir. 1981) 642 F.2d 161; *Holloway* v. *McElroy* (5th Cir. 1980) 632 F.2d 605, cert. den., 451 U.S. 1028 [69 L.Ed.2d 398, 101 S.Ct. 3019]; *Wynn* v. *Mahoney* (4th Cir. 1979) 600 F.2d 448, cert. den., 444 U.S. 950 [62 L.Ed.2d 320, 100 S.Ct. 423].)[2] However, where a state has not thus incorporated the absence of self-defense into the definition of a crime, allocation of this burden to the defendant does not offend due process. (*Jones* v. *Jago* (6th Cir. 1983) 701 F.2d 45; *Carter* v. *Jago* (6th Cir. 1980) 637 F.2d 449, cert. den., 456 U.S. 980 [72 L.Ed.2d 856, 102 S.Ct. 2249]; *Baker* v. *Muncy* (4th Cir. 1980) 619 F.2d 327; *Frazier* v. *Weatherholtz* (4th Cir. 1978) 572 F.2d 994, cert. den., 439 U.S. 876 [58 L.Ed.2d 191, 99 S.Ct. 215].) Our inquiry, therefore, is whether California law defines consciousness as an element of the charged crimes or simply treats unconsciousness as an affirmative defense to those charges.

Section 26 includes unconsciousness among other conditions traditionally considered affirmative defenses, infancy, idiocy, ignorance or mistake of fact, accident and duress. At the time of appellant's trial, section 26 also included the defense of insanity. (See Stats. 1981, ch. 404, § 3, p. 1592; see current § 28, Stats. 1981, ch. 404, § 4, p. 1592.) Similarly, the case law on unconsciousness uniformly refers to it as a "defense." (*People* v. *Ray* (1975) 14 Cal.3d 20, 25 [120 Cal.Rptr. 377, 533 P.2d 1017]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 717-718 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Baker* (1954) 42 Cal.2d 550, 573-577 [268 P.2d 705]; *People* v. *Morrall**\* (Cal.App.); *People* v. *Kozel* (1982) 133 Cal.App.3d 507, 525-526 [184 Cal.Rptr. 208]; *People* v. *Froom* (1980) 108 Cal.App.3d 820, 828 [166 Cal.Rptr. 786]; *People* v. *Caldwell, supra,* 102 Cal.App.3d 461, 476-477.) ■ *Sedeno* states the governing test: "An unconscious act within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional. [Citation.]" (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 717.)

Appellant concedes that the murder, robbery and attempt statutes do not expressly include consciousness as an element of the respective offenses.

---

[2]In *Engle,* the court expressly declined to rule on the validity of this reasoning, stating only that such arguments raised a "colorable" or "plausible" constitutional claim. (*Engle* v. *Isaac, supra,* 456 U.S. 107, 122 [71 L.Ed.2d 783, 796].)

\*Reporter's note: Deleted on direction of Supreme Court by order dated September 14, 1983.

(§§ 187, 188, 211, 663, 664.) Nonetheless, we recognize that consciousness is closely related to both the "actus reus" and "mens rea" components of each of the charged crimes since, as *Sedeno* indicates, it is pertinent both to the voluntariness of a defendant's acts and to his capacity to understand and intend those acts and their consequences.

 A close connection between a condition recognized as a defense and the elements of a crime does not compel the conclusion that absence of that condition is itself an element of the offense. Insanity, too, tends to undermine or negate voluntariness and capacity to harbor criminal intent. (*People* v. *Phillips* (1979) 90 Cal.App.3d 356, 365-367 [153 Cal.Rptr. 359].) Nonetheless, numerous state and federal decisions have rejected the contention that the prosecution is obliged to bear the burden of proof with respect to a defendant's sanity where soundness of mind is not an express prerequisite to commission of the offense. (*Patterson* v. *New York, supra,* 432 U.S. 197, 202-207 [53 L.Ed.2d 281, 287-291] [reaffirming *Leland* v. *Oregon* (1952) 343 U.S. 790 [96 L.Ed. 1302, 72 S.Ct. 1002]]; *People* v. *Drew* (1978) 22 Cal.3d 333, 348-349 [149 Cal.Rptr. 275, 583 P.2d 1318]; *People* v. *Phillips, supra,* 90 Cal.App.3d 356, 364-365; *Krzeminski* v. *Perini* (6th Cir. 1980) 614 F.2d 121, 123-124; *Duisen* v. *Wyrick* (8th Cir. 1977) 566 F.2d 616; see also *Greider* v. *Duckworth* (7th Cir. 1983) 701 F.2d 1228, 1233-1234, fn. 8; *Stacy* v. *Love* (6th Cir. 1982) 679 F.2d 1209, 1213, cert. den., 459 U.S. 1009 [74 L.Ed.2d 400, 103 S.Ct. 364].)

Even more closely on point are recent federal decisions holding that a state may require a defendant to prove his intoxication at the time of an incident as an affirmative defense although the effect of that "defense" is to negate the intent element of the charged crime: "We agree . . . that it is not a denial of due process for the state to place on the defendant the burden of proof by a preponderance of the evidence of an affirmative defense which negates an element of the crime. [Citations.] Here, the state trial court carefully instructed the jury that the state had the burden of proving each element of the crime beyond a reasonable doubt. Although appellant had the burden of proving the affirmative defense by a preponderance of the evidence, such a requirement did not rely upon a presumption or improperly shift the burden of proof to the defendant in the way condemned by the Supreme Court in *Mullaney* v. *Wilbur, supra,* 421 U.S. at p. 701, 95 S.Ct. at 1891." (*Hobgood* v. *Housewright* (8th Cir. 1983) 698 F.2d 962, 963; see also *Long* v. *Brewer* (8th Cir. 1982) 667 F.2d 742, 746-747, cert. den. 459 U.S. 883 [74 L.Ed.2d 153, 103 S.Ct. 189]; *United States* ex rel. *Goddard* v. *Vaughn* (3d Cir. 1980) 614 F.2d 929, 934, cert. den. 449 U.S. 844 [66 L.Ed.2d 53, 101 S.Ct. 127].)

As defined in the California statutes and case law and in the instructions delivered here, the elements of the respective crimes, including the required mental state, are conceptually distinct from the affirmative defense of unconsciousness despite the apparent "logical" overlap between these issues. The jury is first instructed that the prosecution must prove every element of crime including that of intent or specific intent beyond a reasonable doubt.[3] A subsequent instruction informs the jury that it must acquit the defendant if it finds he was unconscious at the time of his acts.[4] The prosecution bears the burden of proving beyond a reasonable doubt the appearance of consciousness, while the defendant's only burden is to "raise a reasonable doubt" as to actual consciousness. As *Engle* indicates, this allocation of burdens does not mark consciousness as an element of the offense rather than an affirmative defense. (*Engle* v. *Isaac, supra,* 456 U.S. 107, 120 [71 L.Ed.2d 783, 795-796].)

Unconsciousness is logically inconsistent with the elements of the respective offenses. However, consciousness is not defined as an element. Accordingly, under *Patterson, Engle* and the decisions concerning insanity and intoxication, the very limited burden-shifting effected by the challenged instruction does not offend due process. Although a state may not "requir[e] a defendant to disprove what was in substance an element of the crime," there is no constitutional bar to "requiring him to prove a defense . . . that may negative an element of the crime . . . . [Citations.]" (*Long* v. *Brewer, supra,* 667 F.2d 742, 747.)

We see no indication in the California case law that state due process protections diverge in any way from federal ones with respect to this issue. (*People* v. *Drew, supra,* 22 Cal.3d 333, 349; see also *People* v. *Roder, supra,* 33 Cal.3d 491 [relying exclusively upon federal Constitution].) Consequently, following federal precedents, we conclude that the presumption of consciousness, historically recognized under California law, does not contravene due process.

C., D. . . . . . . . . . . . . . . . . . . . . . .*

---

[3]We reserve for later discussion distinct questions concerning the adequacy of the specific intent instructions delivered here.

[4]The instructions here properly distinguished between voluntary and involuntary inducement of unconsciousness by intoxication. (See, generally *People* v. *Ray, supra,* 14 Cal.3d 20, 30, fn. 9; *People* v. *Baker, supra,* 42 Cal.2d 550, 573-577; *People* v. *Heffington* (1973) 32 Cal.App.3d 1, 8 [107 Cal.Rptr. 859]; *People* v. *Roy* (1971) 18 Cal.App.3d 537, 550 [95 Cal.Rptr. 884], cert. den. 405 U.S. 976 [31 L.Ed.2d 251, 92 S.Ct. 1202].)

*See footnote, *ante,* page 812.

Reversed.

Caldecott, P. J., and Poché, J., concurred.